BROWN, SECRETARY OF VETERANS AFFAIRS *v.*
GARDNER

No. 93–1128.   Argued October 31, 1994—Decided December 12, 1994

SOUTER, J., delivered the opinion for a unanimous Court.

*Edward C. DuMont* argued the cause for petitioner.
With him on the briefs were *Solicitor General Days, Deputy
Solicitor General Bender,* and *Tresa M. Schlecht.*

*Joseph M. Hannon, Jr.,* argued the cause for respondent. With him on the briefs was *William S. Mailander.* *

JUSTICE SOUTER delivered the opinion of the Court.

In this case we decide whether a regulation of the Department of Veterans Affairs, 38 CFR § 3.358(c)(3) (1993), requiring a claimant for certain veterans' benefits to prove that disability resulted from negligent treatment by the VA or an accident occurring during treatment, is consistent with the controlling statute, 38 U. S. C. § 1151 (1988 ed., Supp. V). We hold that it is not.

I

Fred P. Gardner, a veteran of the Korean conflict, received surgical treatment in a VA facility for a herniated disc unrelated to his prior military service. Gardner then had pain and weakness in his left calf, ankle, and foot, which he alleged was the result of the surgery. He claimed disability benefits under § 1151,[1] which provides that the VA will compensate for "an injury, or an aggravation of an injury," that occurs "as the result of hospitalization, medical or surgical treatment, or the pursuit of a course of vocational rehabilitation" provided under any of the laws administered by the VA, so long as the injury was "not the result of such veteran's own willful misconduct . . . ." The VA and the Board

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Texas by *Dan Morales,* Attorney General, and *Jorge Vega,* First Assistant Attorney General; for the National Veterans Legal Services Project by *Ronald S. Flagg* and *Gershon M. Ratner;* and for the Paralyzed Veterans of America et al. by *Robert L. Nelson, Lawrence B. Hagel,* and *Irving R. M. Panzer.*

[1] Section 1151 is invoked typically to provide benefits to veterans for nonservice related disabilities, although it is not so limited by its terms. See Pet. for Cert. 6, n. 3. The statute's history begins in 1924 when Congress enacted § 213 of the World War Veterans' Act, 1924, ch. 320, 43 Stat. 623. Section 213 was repealed in 1933, as part of the Economy Act of 1933, ch. 3, Tit. I, § 17, 48 Stat. 11–12, and reenacted in nearly the same form in 1934, Act of Mar. 28, 1934, ch. 102, Tit. III, § 31, 48 Stat. 526.

of Veterans' Appeals denied Gardner's claim for benefits, on the ground that § 1151, as interpreted by 38 CFR § 3.358(c)(3) (1993), only covers an injury if it "proximately resulted [from] carelessness, negligence, lack of proper skill, error in judgment, or similar instances of indicated fault" on the part of the VA, or from the occurrence during treatment or rehabilitation of an "accident," defined as an "unforeseen, untoward" event. The Court of Veterans Appeals reversed, holding that § 1151 neither imposes nor authorizes adoption of the fault-or-accident requirement set out in § 3.358(c)(3), *Gardner* v. *Derwinski*, 1 Vet. App. 584 (1991), and the Court of Appeals for the Federal Circuit affirmed, 5 F. 3d 1456 (1993). We granted certiorari, 511 U. S. 1017, and now affirm.

II

Despite the absence from the statutory language of so much as a word about fault[2] on the part of the VA, the Government proposes two interpretations in attempting to reveal a fault requirement implicit in the text of § 1151, the first being that fault inheres in the concept of compensable "injury." We think that no such inference can be drawn in this instance, however. Even though "injury" can of course carry a fault connotation, see Webster's New International Dictionary 1280 (2d ed. 1957) (an "actionable wrong"), it just as certainly need not do so, see *ibid.* ("[d]amage or hurt done to or suffered by a person or thing"). The most, then, that the Government could claim on the basis of this term is the existence of an ambiguity to be resolved in favor of a fault requirement (assuming that such a resolution would be possi-

---

[2] "Fault" is shorthand for fault-or-accident, the test imposed by the regulation. Section 3.358(c)(3) leaves the additional burden imposed by the "accident" requirement unclear, defining the term to mean simply an "unforeseen, untoward" event. Although the appropriate scope of the "accident" requirement is not before us, on one plausible reading of the regulation some burden additional to the statutory obligation would be imposed as an alternative to fault.

ble after applying the rule that interpretive doubt is to be resolved in the veteran's favor, see *King* v. *St. Vincent's Hospital,* 502 U. S. 215, 220–221, n. 9 (1991)). But the Government cannot plausibly make even this claim here. Ambiguity is a creature not of definitional possibilities but of statutory context, see *id.,* at 221 ("[T]he meaning of statutory language, plain or not, depends on context"), and this context negates a fault reading. Section 1151 provides compensability not only for an "injury," but for an "aggravation of an injury" as well. "Injury" as used in this latter phrase refers to a condition prior to the treatment in question, and hence cannot carry with it any suggestion of fault attributable to the VA in causing it. Since there is a presumption that a given term is used to mean the same thing throughout a statute, *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 433 (1932), a presumption surely at its most vigorous when a term is repeated within a given sentence, it is virtually impossible to read "injury" as laden with fault in the sentence quoted.

Textual cross-reference confirms this conclusion. "Injury" is employed elsewhere in the veterans' benefits statutes as an instance of the neutral term "disability," appearing within a series whose other terms exemplify debility free from any fault connotation. See 38 U. S. C. § 1701(1) (1988 ed., Supp. V) ("The term 'disability' means a disease, injury, or other physical or mental defect"). The serial treatment thus indicates that the same fault-free sense should be attributed to the term "injury" itself. *Jarecki* v. *G. D. Searle & Co.,* 367 U. S. 303, 307 (1961) ("[A] word is known by the company it keeps"). Moreover, in analogous statutes dealing with service-connected injuries the term "injury" is again used without any suggestion of fault, as the administrative regulation applicable to these statutes confirms by its failure to impose any fault requirement. Compare 38 U. S. C. § 1110 (1988 ed., Supp. V) ("disability resulting from personal injury suffered or disease contracted in line of duty,

or for aggravation of a preexisting injury suffered or disease contracted in line of duty, . . . during a period of war," is compensable) and 38 U. S. C. § 1131 (1988 ed., Supp. V) ("disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, . . . during other than a period of war," is compensable) with 38 CFR § 3.310(a) (1993) ("Disability which is proximately due to or the result of a service-connected disease or injury shall be service connected. When service connection is thus established for a secondary condition, the secondary condition shall be considered a part of the original condition").

In a second attempt to impose a VA-fault requirement, the Government suggests that the "as a result of" language of § 1151 signifies a proximate cause requirement that incorporates a fault test. Once again, we find the suggestion implausible. This language is naturally read simply to impose the requirement of a causal connection between the "injury" or "aggravation of an injury" and "hospitalization, medical or surgical treatment, or the pursuit of a course of vocational rehabilitation." Assuming that the connection is limited to proximate causation so as to narrow the class of compensable cases, that narrowing occurs by eliminating remote consequences, not by requiring a demonstration of fault.[3] See generally W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 42 (5th ed. 1984). The eccentricity of reading a fault requirement into the "result

---

[3] We do not, of course, intend to cast any doubt on the regulations insofar as they exclude coverage for incidents of a disease's or injury's natural progression, occurring after the date of treatment. See 38 CFR § 3.358(b)(2) (1993). VA action is not the cause of the disability in these situations. Nor do we intend to exclude application of the doctrine *volenti non fit injuria*. See generally M. Bigelow, Law of Torts 39–43 (8th ed. 1907). It would be unreasonable, for example, to believe that Congress intended to compensate veterans for the necessary consequences of treatment to which they consented (*i. e.*, compensating a veteran who consents to the amputation of a gangrenous limb for the loss of the limb).

of" language is underscored by the incongruity of applying it to the fourth category for which compensation is available under § 1151, cases of injury resulting from a veteran's "pursuit of vocational rehabilitation." If Congress had meant to require a showing of VA fault, it would have been odd to refer to "the pursuit [by the veteran] of vocational rehabilitation" rather than to "the provision [by the VA] of vocational rehabilitation."

The poor fit of this language with any implicit requirement of VA fault is made all the more obvious by the statute's express treatment of a claimant's fault. The same sentence of § 1151 that contains the terms "injury" and "as a result of" restricts compensation to those whose additional disability was not the result of their "own willful misconduct." This reference to claimant's fault in a statute keeping silent about any fault on the VA's part invokes the rule that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *United States*, 464 U. S. 16, 23 (1983) (internal quotation marks omitted). Without some mention of the VA's fault, it would be unreasonable to read the text of § 1151 as imposing a burden of demonstrating it upon seeking compensation for a further disability.

In sum, the text and reasonable inferences from it give a clear answer against the Government, and that, as we have said, is "'the end of the matter.'" *Good Samaritan Hospital* v. *Shalala*, 508 U. S. 402, 409 (1993) (quoting *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984)). Thus this clear textually grounded conclusion in Gardner's favor is fatal to the remaining principal arguments advanced against it.

The Government contends that Congress ratified the VA's practice of requiring a showing of fault when it reenacted the predecessor of § 1151 in 1934, or, alternatively, that Con-

gress's legislative silence as to the VA's regulatory practice over the last 60 years serves as an implicit endorsement of its fault-based policy. There is an obvious trump to the reenactment argument, however, in the rule that "[w]here the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction." *Demarest* v. *Manspeaker*, 498 U. S. 184, 190 (1991). See also *Massachusetts Trustees of Eastern Gas & Fuel Associates* v. *United States*, 377 U. S. 235, 241–242 (1964) (congressional reenactment has no interpretive effect where regulations clearly contradict requirements of statute). But even without this sensible rule, the reenactment would not carry the day. Setting aside the disputed question whether the VA used a fault rule in 1934,[4] the record of congressional discussion preceding reenactment makes no reference to the VA regulation, and there is no other evidence to suggest that Congress was even aware of the VA's interpretive position. "In such circumstances we consider the . . . re-enactment to be without significance." *United States* v. *Calamaro*, 354 U. S. 351, 359 (1957).

Congress's post-1934 legislative silence on the VA's fault approach to § 1151 is likewise unavailing to the Government. As we have recently made clear, congressional silence " 'lacks persuasive significance,' " *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 187 (1994) (quoting *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 650 (1990)), particularly where administrative regulations are inconsistent with the controlling statute, see *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 175, n. 1 (1989) ("Congressional inaction cannot amend a duly enacted statute"). See also *Zuber* v. *Allen*, 396 U. S. 168, 185–186, n. 21 (1969) ("The verdict of quiescent years cannot be invoked to baptize a statutory gloss that is

---

[4] At the time of the 1934 reenactment, the regulation in effect precluded compensation for the " 'usual after[-]results of approved medical care and treatment properly administered.' " See Brief for Respondent 31.

otherwise impermissible. . . . Congressional inaction frequently betokens unawareness, preoccupation, or paralysis").

Finally, we dispose of the Government's argument that the VA's regulatory interpretation of § 1151 deserves judicial deference due to its undisturbed endurance for 60 years. A regulation's age is no antidote to clear inconsistency with a statute, and the fact, again, that § 3.358(c)(3) flies against the plain language of the statutory text exempts courts from any obligation to defer to it. *Dole* v. *Steelworkers*, 494 U. S. 26, 42–43 (1990); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc., supra,* at 842–843. But even if this were a close case, where consistent application and age can enhance the force of administrative interpretation, see *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 450 (1978), the Government's position would suffer from the further factual embarrassment that Congress established no judicial review for VA decisions until 1988, only then removing the VA from what one congressional Report spoke of as the agency's "splendid isolation." H. R. Rep. No. 100–963, pt. 1, p. 10 (1988). As the Court of Appeals for the Federal Circuit aptly stated: "Many VA regulations have aged nicely simply because Congress took so long to provide for judicial review. The length of such regulations' unscrutinized and unscrutinizable existence" could not alone, therefore, enhance any claim to deference. 5 F. 3d, at 1463–1464.

### III

Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*