RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SAMMY LEE TERRELL,

        *Petitioner-Appellee,*

    *v.*

UNITED STATES OF AMERICA,

        *Respondent-Appellant.*

No. 07-2546

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-72353—Denise Page Hood, District Judge.

Argued: January 16, 2009

Decided and Filed: March 26, 2009

Before: KENNEDY, COLE, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. James R. Gerometta, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. James R. Gerometta, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellee.

———————————

**OPINION**

———————————

KENNEDY, Circuit Judge. This case presents the federal courts of appeals with an issue of first impression. Can the United States Parole Commission ("Commission") use videoconferencing to conduct parole determination proceedings? Habeas petitioner Sammy Terrell challenged this practice as a violation of 18 U.S.C. § 4208(e) and his due process rights under the Fifth Amendment, and he prevailed in the district court on due process

grounds. We conclude that the statute requires parole determination proceedings to be held in person, and so for the following reasons, affirm the judgment of the district court.

## BACKGROUND

Sammy Terrell is a federal prisoner who was, at the time of his petition, serving his life sentence in Marquette, Michigan.[1] Terrell robbed eleven banks. In 1983, he pleaded guilty to three bank robberies and was incarcerated. From 1983 to 1991, while in prison, Terrell committed 20 misconducts, one of which was the murder of a fellow inmate in 1985. His conviction for first degree murder resulted in a life sentence. Since that time, Terrell has maintained clear conduct, received favorable performance evaluations for his job assignments, and written a book on resolving drug and gang violence.

In 1994, Terrell was given his initial parole determination proceeding.[2] The Commission continued him to a 15-year reconsideration hearing[3] in June 2009. Interim parole hearings[4]–which did not change his 15-year reconsideration hearing date–took place in 1996, 1998, and 2003.[5] He waived his interim hearing scheduled for September of 2000. Terrell was scheduled for an interim hearing by video conference on June 9, 2005. He requested a continuance, which the Commission granted.

---

[1]Terrell was being boarded by the United States Bureau of Prisons at the Michigan state correctional facility in Marquette at the time he filed his habeas petition.

[2]Pursuant to18 U.S.C. § 4208(a), an initial parole determination hearing "shall be held not later than thirty days before the date" in which the prisoner is eligible for release on parole. Terrell became eligible for parole after serving ten years of a life sentence. 18 U.S.C. § 4205(a).

[3]Pursuant to 28 C.F.R. § 2.14(c), 15-year reconsideration hearings are "full reassessment[s] of the [prisoner's] case."

[4]Pursuant to 28 C.F.R. § 2.14(a), interim proceedings consider "significant developments or changes in the prisoner's status that may have occurred subsequent to the initial hearing." After an interim hearing, the Commission may alter the presumptive date of release or the date of the 15-year reconsideration hearing.

[5]Pursuant to 18 U.S.C. § 4208(h), parole determination proceedings shall be held not less frequently than every "twenty-four months in the case of a prisoner with a" life sentence.

Terrell and prisoner Richard Thompson[6] filed petitions for writs of habeas corpus[7] in the Eastern District of Michigan on June 14, 2005, asking the court to order in-person parole determination hearings. On February 3, 2006, a magistrate judge recommended that the court deny Terrell's petition. Terrell was given an interim hearing by video conference on May 11, 2006. On September 30, 2007, the district court rejected the recommendation of the magistrate judge and held that videoconferencing violated the prisoner's due process rights. The district court then ordered an in-person parole determination hearing for Terrell. The government moved for a stay to ensure appellate review, and the district court denied the motion. On September 15, 2008, this court granted a stay of the district court's order to give Terrell an in-person hearing to ensure appellate review of the matter.

## ANALYSIS

The Parole Commission Reorganization Act of 1976, Pub. L. No. 94-233, 90 Stat. 219 (Mar. 15, 1976), enacted into law 18 U.S.C. §§ 4201-4218, which includes 18 U.S.C. § 4208(e) and the requirement that "[t]he prisoner shall be allowed to appear and testify on his own behalf at the parole determination hearing." The Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (Oct. 12, 1984), replaced parole with supervised release. However, prisoners who committed offenses prior to November 1, 1987 remained eligible for parole according to the pre-Sentencing Reform Act system. *See Vershish v. U.S. Parole Comm'n*, 405 F.3d 385, 388 n.2 (6th Cir. 2005). Congress has repeatedly passed legislation to keep the pre-Sentencing Reform Act parole system alive for those prisoners who committed crimes prior to November 1, 1987. The latest is the United States Parole Commission Extension Act of 2008, Pub. L. No. 110-312, 122 Stat. 3013 (Aug. 12, 2008), which extended the life of the parole system until November 1, 2011. In between 1976 and 1984, no amendments were made to the text of 18 U.S.C. § 4208 or any related statute in a way that might affect its meaning.

---

[6] Thompson's claim became moot after he was given an in-person parole determination hearing.

[7] Pursuant to 28 U.S.C. § 2241.

Until 2004, the Commission conducted all parole determination hearings in person at the institutions where the prisoners were incarcerated. In early 2004, the Commission began a pilot project to conduct parole release hearings by video conference at a few institutions. The Commission published notice of the project in the Federal Register under the title, "Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the United States and District of Columbia Codes," 69 Fed. Reg. 5,273 (Feb. 4, 2004). The Commission also promulgated rules allowing for videoconferencing, 28 C.F.R. § 2.25, and eliminated the "in person" requirement for hearings by amending 28 C.F.R. § 2.72(a). The proffered reason was to "reduce travel costs and conserve the time of its hearing examiners" without diminishing "the prisoner's ability to effectively participate in the hearing." 69 Fed. Reg. 5,273.

In April of 2005, the Commission announced that the pilot program was a success. Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the United States and District of Columbia Codes, 70 Fed. Reg. 19,262 (April 13, 2005). The Commission concluded that "the prisoner's ability to effectively participate in the hearing ha[d] not been diminished by" videoconferencing. *Id.* "Video and audio transmissions [were] clear and the hearings [were] seldom interrupted by technical difficulties." *Id.* The Commission then extended the use of videoconferencing to parole revocation hearings and amended 28 C.F.R. § 2.25 accordingly. *Id.* The question before this court is the validity of using videoconferencing in parole determination hearings in light of the statutory requirement of 18 U.S.C. § 4208(e) and Fifth Amendment due process.

I.     Jurisdiction

Before we address the habeas petition on its merits, we must first conclude that we have jurisdiction to entertain the petition. Neither of the parties addressed the jurisdiction of the court, presumably because they both sought to have the substantive issue decided. The district court did not address jurisdiction. However, we have an obligation to raise issues of jurisdiction sua sponte. *Cf. Smith v. Ohio Dep't of Rehab. and Corr.*, 463 F.3d 426, 430 n.2 (6th Cir. 2006).

Terrell commenced his claim by petitioning the district court to enter an order, pursuant to 28 U.S.C. § 2241, to require the Commission to give him a live in-person parole hearing. Terrell contends that the Commission violated statutory law and his constitutional right to due process when it denied his request for an in-person hearing. He does not contend that remedying the Commission's procedural violation will necessarily entitle him to an earlier release from custody. Release on parole is discretionary. In 1977, in *Wright v. U.S. Bd. of Parole*, 557 F.2d 74 (6th Cir. 1977), we held that a federal prisoner could challenge the process used to make his denial of parole determination as part of a § 2241 habeas petition. *Id.* at 76; *see also Kellogg v. Shoemaker*, 46 F.3d 503, 507 n.3 (6th Cir. 1995) (noting that, in the future, any remedy "a member of the class has for the unconstitutional application of the old parole procedures must . . . be obtained through habeas corpus"). The petitioner argued that the proceeding denying release on parole was flawed in its use of guidelines and the lack of a sufficient explanation. *Id.* He requested a new hearing, or in the alternative, release on parole. *Id.* We held that such a challenge was cognizable under § 2241 as a challenge to the execution of his sentence. *Id.* at 77. Thus, our holding in *Wright* indicates that Terrell can proceed under § 2241.

Before and since that time, the Supreme Court has made a number of decisions regarding the relationship between habeas and § 1983, starting in 1973 with *Preiser v. Rodriguez*, 411 U.S. 465 (1973), and continuing with *Wolff v. McDonnell*, 418 U.S. 539 (1974), *Heck v. Humphrey*, 512 U.S. 477 (1994), *Edwards v. Balisok*, 520 U.S. 641 (1997), and *Wilkinson v. Dotson*, 544 U.S. 74 (2005), *aff'g*, 329 F.3d 463 (6th Cir. 2003) (en banc). The Court in *Preiser*, *Heck*, and *Balisok* held that a challenge, respectively, of a prisoner's underlying conviction or sentence, that necessarily demonstrated the invalidity of the confinement's legality, or that would result in the restoration of good-time credits which necessarily shortens the duration of confinement, can only be brought under habeas. *Dotson*, 544 U.S. at 78-81. In *Wolff* and *Dotson*, the Court held that challenges by state prisoners to procedures that would only lead to new proceedings, discretionary and not necessarily spelling immediate release or a shorter duration of confinement, may be brought under § 1983. *Dotson*, 544 U.S. at 81-82.

A question that arises from this line of cases is whether habeas and § 1983 (or the equivalent for a federal prisoner) are mutually exclusive actions. The circuits appear to be in conflict on this question. In *Wright*, we held that the claim before us could be brought as a § 2241 habeas action. In *Dotson*, the Supreme Court held that a claim, a constitutional challenge to parole procedures that would at most order a new discretionary hearing, akin to the claim before us, was properly brought under § 1983. If the *Presier* line of cases, decided since *Wright*, also indicated that the actions are mutually exclusive, then we must conclude that we lack jurisdiction to entertain Terrell's habeas petition.

Other courts of appeals have suggested that habeas and § 1983 claims (and the equivalent for a federal prisoner) are mutually exclusive.[8] The Seventh Circuit has held that "a [federal] prisoner claiming a right to *release* on parole must use § 2241 (or § 2254 for a state prisoner); but a prisoner claiming that parole officials are apt to use incorrect rules when resolving a future application must use the [Administrative Procedure Act ("APA")] (or 42 U.S.C. § 1983 for a state prisoner)." *Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004). The Supreme Court's decision in *Dotson* suggests that Terrell's claim falls on the APA/§ 1983 side of the line, assuming such a line, which would preclude a § 2241 challenge under the Seventh Circuit's holdings that those actions are mutually exclusive.

The Ninth Circuit rejects the mutual exclusivity of such claims. *See Docken v. Chase*, 393 F.3d 1024, 1031 (9th Cir. 2004). The court in *Docken* pointed out that "the question of the relationship between habeas and § 1983 relief has only explicitly come up before in converse form: whether claims are *not* cognizable under § 1983 because their resolution will necessarily impact the fact and duration of confinement." *Id.* (the

---

[8]Only the Seventh Circuit and the Eleventh Circuit have suggested that habeas is mutually exclusive from a § 1983 (or § 1983-kind of) claim. *See Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006); *Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004). The Eleventh Circuit appears to have erred in using the phrase "mutually exclusive." In its decision in *Hutcherson*, the court stated that habeas and § 1983 are "mutually exclusive: if a claim can be raised in a federal habeas petition, that same claim cannot be raised in a separate § 1983 civil rights action." 468 F.3d at 754. However, the court never stated why the converse was true. The court then held that the plaintiff's § 1983 claim could only be brought under habeas, following the rule from the *Preiser* line of cases that habeas can under certain circumstances be the exclusive action available, but not addressing whether the same could be true of § 1983.

court's conclusion after looking at the *Preiser* line of cases and its own precedents). Section 1983 "intrudes into the more specific realm of habeas, not the other way around." *Id.* at 1028. Therefore, only for claims falling in the "core" of habeas–those necessarily implicating the fact or duration of confinement as delineated by *Preiser* and its progeny–does habeas provide the exclusive action; otherwise, there exist claims that can both be brought under habeas and § 1983 (or an equivalent civil action).

To understand the reasoning of the Seventh and Ninth Circuits, we must first examine the various claims that can be brought under a habeas petition. Sections 2255 and 2241 provide the habeas statutory scheme for federal prisoners. *Wright*, 557 F.2d at 77. Section 2255 provides the primary avenue of relief for federal prisoners "claiming the right to release" as a result of an unlawful sentence. 28 U.S.C. § 2255(a). The "savings clause" of § 2255 allows for a § 2241 action if § 2255 is "inadequate or ineffective to test the legality of the detention." *Witham v. United States*, 355 F.3d 501, 505 (6th Cir. 2004) (quoting 28 U.S.C. § 2255(e)). "Construing [the savings clause], courts have uniformly held that claims asserted by federal prisoners that seek to challenge their convictions or imposition of their sentence shall be filed in the [jurisdiction of the] sentencing court under 28 U.S.C. § 2255, and that claims seeking to challenge the execution or manner in which the sentence is served shall be filed in the court having jurisdiction over the prisoner's custodian under 28 U.S.C. § 2241."[9] *Charles v. Chandler*, 180 F.3d 753, 755-56 (6th Cir. 1999) (per curiam) (internal citations omitted); *see also Doganiere v. United States*, 914 F.2d 165, 169-70 (9th Cir. 1990) (§ 2255 action challenging the Parole Commission's discretionary decision in setting petitioner's term of parole should have been brought under § 2241); *Hajduk v. United States*, 764 F.2d 795, 796 (11th Cir. 1985) (holding that "challenge to the lawfulness of the [federal] parole commission's actions" in retroactively applying parole guidelines must be brought under § 2241 and not § 2255). Section 2241 also exists to provide a remedy to test the legality of detention where § 2255 is otherwise inadequate. *See*, *e.g.*, *Witham*, 355 F.3d at 505.

---

[9]Terrell properly filed his § 2241 petition in the Eastern District of Michigan, the place of his custodian.

Because state prisoners "contest the fact or duration of custody" when they "challenge their convictions, their sentences, or administrative orders revoking good-time credits or equivalent sentence-shortening devices," they "must seek habeas corpus" according to the Seventh Circuit's analysis distinguishing those mutually exclusive domains of habeas and § 1983. *Moran v. Sondalle*, 218 F.3d 647, 650-51 (7th Cir. 2000) (per curiam). Indeed, the Seventh Circuit must be correct that such claims can be brought only under habeas as determined by the *Preiser* line of cases. *Dotson*, 329 F.3d at 466-68. In that respect, the Seventh and Ninth Circuits agree. However, the Ninth Circuit envisions "a class of suits outside of the core habeas claims identified in *Preiser*." *Docken*, 393 F.3d at 1028-29. Of course, such claims would be § 2241 claims challenging the execution of the prisoner's sentence, not 28 U.S.C. § 2255 claims challenging the imposition or duration of the prisoner's sentence. That captures the dispute between the Seventh Circuit and the Ninth Circuit. The Seventh Circuit considers the claims the Supreme Court held *must* be brought as habeas actions pursuant to the *Preiser* line of cases–whether under § 2255 or § 2241–as coextensive with the claims that *can* be brought under habeas in its totality. In other words, there are no "suits outside of the core habeas claims identified in *Preiser*," *Docken*, 393 F.3d at 1028-29, for which jurisdiction might overlap with § 1983 (or the APA).

The Supreme Court's opinion affirming our en banc decision in *Dotson* captures this debate. The majority held that challenges to parole procedures that would not "necessarily spell speedier release" and claimed "*future* relief (which, if successful, [would] not necessarily imply the invalidity of confinement or shorten its duration)" were "yet more distant" from the "core" of habeas within which habeas is the exclusive available action. 544 U.S. at 82. Therefore, the challenge could be brought under § 1983. *Id.* Justice Scalia (joined by Justice Thomas), concurring, wrote separately to emphasize that he believed that such claims could be brought under § 1983 but could not be brought under habeas. *Id.* at 85 (Scalia, J., concurring). He quoted the Seventh Circuit for the proposition that "permissible habeas relief" authorizes "a quantum change in the level of custody." *Id.* at 86 (quoting *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991)). "[T]he mandating of a new parole hearing that may or may not result in

release" with the "specification of the procedures to be followed" cannot be brought under a habeas proceeding because it "neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody." *Id.* Under the view Justice Scalia shares with the Seventh Circuit, habeas is the exclusive available action for the domain over which habeas is available, which is for claims that would change the level of custody, shorten its duration, or terminate it completely. The majority left open the question we have here of whether the procedural challenge could be brought under both § 1983 and habeas.

Our cases have held that the action before us can both be brought under habeas and the equivalent civil action. The upshot of this is that neither the Seventh Circuit's reasoning nor Justice Scalia's reasoning concurring in *Dotson* applies here because both would deny the existence of the situation before us where a challenge to procedures used in the administration of discretionary parole falls under habeas. Assuming such a situation, the Ninth Circuit is correct that nothing in the *Preiser* line of cases suggests that *Wright* has been overruled for the mere reason that the Court has decided that the claim before us also falls under the equivalent of § 1983 for federal prisoners. Thus, we conclude we have jurisdiction to entertain Terrell's habeas petition.

II.    Statutory Interpretation

Terrell has raised both statutory and constitutional challenges to the Commission's procedures. We address the statutory challenge first. *Cf. Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

The district court granted summary judgment to Terrell after concluding that "appear" in 18 U.S.C. § 4208(e) unambiguously required an in-person hearing. The government argues on appeal that "appear" is ambiguous, and therefore, the Commission should receive deference as to its interpretation of the statute that videoconferencing is permissible. The two-step inquiry we must conduct is governed by *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). If the statute is unambiguous, the

unambiguous meaning controls. *Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 474-75 (6th Cir. 2008) (citing *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)).  If the statute is ambiguous, then we defer to the agency's interpretation of the statute if it is permissible.  *Id.*  In this case, if we were to conclude that the statute is unambiguous, an in-person hearing would be required; otherwise, we would defer to the agency's interpretation that videoconferencing satisfies the "appear" requirement.  Therefore, whether the statute is ambiguous or unambiguous drives the outcome of this case.

The government acknowledges that "when Congress enacted the Parole Commission Reorganization Act and § 4208(e) more than 30 years ago in 1976, it assumed that parole release hearings would be conducted with hearing examiners and prisoners present together at correctional institutions" as part of in-person hearings. That, however, should not preclude the Commission from being able to adapt to subsequent technological developments such as videoconferencing, the government argues.

In other words, at the time Congress enacted 18 U.S.C. § 4208(e), the meaning of "appear" was unambiguous. Subsequent technological developments made "appear" ambiguous because videoconferencing offered an alternative to in-person hearings in which all participating persons would still be visible to and be able to interact with each other. The problem with this argument is that statutory ambiguity must be determined at the time the language was enacted into law. *See Carcieri v. Salazar*, — U.S. —, 129 S. Ct. 1058, 1064 (2009) (citing *Director, Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 272 (1994)) ("We begin with the ordinary meaning of the word 'now,' as understood when the [Indian Reorganization Act] was enacted," in 1934, for the purposes of *Chevron*.); *MCI Telecomm. Corp. v. AT & T Co.*, 512 U.S. 218, 228 (1994) (citing *Perrin v. United States*, 444 U.S. 37, 42-45 (1979)) ("the most relevant time for determining a statutory term's meaning" is "when [the statute in which the term appears] became law"). At the time "appear" pursuant to 18 U.S.C. § 4208(e) was enacted into law, videoconferencing did not exist and, unambiguously, "appear"

required an in-person hearing.[10] No subsequent technological development can change that fact.[11] *See also Texas v. United States*, 497 F.3d 491, 503-04 (5th Cir. 2007) (holding that court decisions subsequent to the enactment of a statute cannot have an effect on statutory ambiguity; a statute's ambiguity is set when it is enacted and when statutes are subsequently added or amended, altering the statutory scheme in which the statute at issue sits).

The ambiguous/unambiguous split of the Chevron two-step is meant to determine those aspects of an agency's authority in which it has discretion to carry out policy as it sees fit. *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740-41 (1996) (citing *Chevron*, 467 U.S. at 843-44). Where Congress has unambiguously made clear what it requires, an agency does not have any discretion. *Id.* This makes clear that ambiguity for the purposes of the Chevron two-step cannot emerge over time subsequent to the enactment of the relevant language because delegated authority cannot emerge out of authority that Congress did not delegate in the first instance.

"Fashioning policies in response to events that were unforeseeable when the legislation was written is one of the primary functions of executive agencies," *Independent Bankers Ass'n v. Marine Midland Bank*, 757 F.2d 453, 461 (2d Cir. 1985) (citing *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 309-10 (1953)), but that statement only applies to delegated authority. Put differently, the above statement militates in favor of deference to an agency's interpretation as part of Chevron step two; it does not help us choose between deciding the case based on *Chevron* step one or step two. *Id.* at 459-60 (determining that the language of the statute is ambiguous and so

---

[10]Parole has been abolished for federal prisoners, but that did not result in any changes to the statutory scheme for those who remain eligible for parole. As a result, there have not been any changes to 18 U.S.C. § 4208 or the statutory scheme of parole generally which would change our analysis from understanding "appear" in 1976 to some later time.

[11]Congress "has directly spoken to the precise question at issue" when it employs "unambiguous statutory language." *Alliance for Cmty. Media v. FCC*, 529 F.3d 763 (6th Cir. 2008) (citing *Chevron*, 467 U.S. at 842) (internal quotation marks omitted). If "appear" unambiguously means live and in person, then the statute is unambiguous for the purposes of *Chevron* step one. The question is not whether Congress spoke directly on the precise question of videoconferencing as the district court suggested. Regardless, if "appear" unambiguously means physically present, then that precludes the possibility of conducting proceedings via videoconferencing.

turning to the question of whether the court should defer to the agency's interpretation of the statute).  When the statute is unambiguous, there has been no delegation to the agency to interpret the statute and therefore the agency's interpretation deserves no consideration at all, much less deference.  *Cf. United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (quoting *Chevron*, 467 U.S. at 843-44) ("[w]hen Congress has explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation") (internal quotation marks omitted).  If unforeseeable events change an area in which Congress has not delegated authority to the agency, only Congress can amend the statute to respond to those unforeseen events.  *See Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374-75 (1986).

To determine the unambiguously expressed intent of Congress at the time of enactment in 1976, we look to the plain meaning of the statute.  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).  "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."  *Id.* (citing *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 403-05 (1988)).  As did the Court in *Carcieri*, we first look to the ordinary meaning of the word at issue, and then we read the word in the context of the statutory scheme at issue.  129 S. Ct. at 1064.

A word's ordinary meaning is often determined by reference to dictionaries.  *See MCI Telecomm.*, 512 U.S. at 225; *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 418 (1992).  The government argues that "[t]he primary definition of 'appear' is to 'become or be visible.'"  *See The American Heritage Dictionary of the English Language* 86 (4th ed. 2006); *The Oxford Dictionary and Thesaurus* 62 (1996).  At the time the statute was enacted, this unambiguously meant that the prisoner appeared in person in front of the hearing examiner because no technology existed to project the prisoner's visage into the room with the hearing examiner.  The only way for a prisoner

to be visible to the hearing examiner was by sharing the same physical presence.[12] The fourth definition of "appear" is "to present oneself formally before an authority or tribunal . . . ." *The Oxford Dictionary and Thesaurus* 62 (1996); *see also The American Heritage Dictionary of the English Language* 86 (4th ed. 2006) (including "[t]o present oneself formally before a court as defendant, plaintiff, or counsel" among the definitions of "appear"). In 1976, to appear meant to be physically present.

The government argues that the district court erred in analogizing "appear" and "testify" with formal trial proceedings. Citing legislative history, it points out that a prisoner's procedural rights at a parole determination proceeding "should not be construed as analogous to formal judicial process." *See* H.R. Rep. No. 94-838 (1976). Analogizing "appear" as it is used in 18 U.S.C. § 4208(e) with other uses of "appear" as they appear in the United States Code might fail for this reason. But the lack of a desire for formal judicial processes for parole determination proceedings does not then mean that Congress could not include some elements of a formal judicial process into a parole determination hearing, nor does it contradict that the plain meaning of "appear" in 18 U.S.C. § 4208(e) requires the prisoner to be physically present at a live hearing. Furthermore, the House Conference Report focused on its rejection of a parole determination process akin to a formal judicial proceeding specifically with respect to representation of the prisoner and testimony at the hearing. H.R. Rep. No. 94-838 (1976). Through the crafting of the statute's text, Congress dictates the elements of a formal judicial process that it will include in the parole determination proceeding, that which it might exclude, and that which it might leave up to the agency to decide.

The statutory scheme supports this interpretation.[13] "Ambiguity is a creature not of definitional possibilities but of statutory context," *Brown v. Gardner*, 513 U.S. 115, 118 (1994), even where courts have emphasized dictionary definitions to discern a

---

[12]The government does not argue that videoconferencing is equivalent to an in-person physical appearance.

[13]A full-blown construction of the statute is not called-for because the meaning of the statute must be plain for the purposes of *Chevron* step one; the point of the fork between *Chevron* step one and two is to determine whose interpretation of the statute should have primacy, the agency or the judiciary.

word's plain meaning, *Appoloni v. United States*, 450 F.3d 185, 199 (6th Cir. 2006). 18 U.S.C. § 4208(e) states that a prisoner "shall be allowed to appear and testify on his own behalf at the parole determination proceeding." The prisoner is not just to "appear," he is to "appear at" the proceeding. This disposes of the government's argument that a "secondary meaning [of "appear"] is to 'present oneself' formally before a court or body" such that "an attorney makes [an] 'appearance' in this Court by signed document listing her address, stating that she is a member of the bar, and asserting that she represents a party in a particular case," all of which occur without the attorney appearing in person. The statute does not simply provide for a prisoner to "appear," he is allowed to "appear and testify at" the proceeding.

18 U.S.C. § 4208(b) states that: "At least thirty days prior to any parole determination proceeding, the prisoner shall be provided with [] written notice of the time and *place* of the proceeding . . . ." (emphasis added). This provides for one place for all persons participating in the proceeding at which the persons are to appear, rather than allowing persons to be physically present at multiple different places but connected by videoconferencing. Video conferences are held at a particular *time*, not at a particular time *and* place. This is not a mere linguistic trick: to be in one place as contemplated by the statute means to share the same physical presence. Therefore, all of the parties are to appear at the place where the proceeding will be held as contemplated by the statute in 1976.

The power of the Commission to "delegate to hearing examiners any powers necessary to conduct hearings and proceedings," 18 U.S.C. § 4203(c)(2), does not suggest that the Commission can allow videoconferencing where in-person parole hearings are required by the statutory scheme. In other words, the Commission can delegate powers to hearing examiners that it can exercise itself. This provision only describes the relationship between the Commission and the hearing examiners, not the extent to the Commission's power writ large. 18 U.S.C. § 4203(c)(2) does not facilitate the interpretation that the Commission can prescribe videoconferencing for parole determination hearings.

Assuming Congress did not envision videoconferencing for parole proceedings in 1976, the government argues that the word "appear," understood in 1976, can still "accommodate . . . subsequent technological advances." Its argument that simply because appearing at a parole hearing "could [not] be accomplished by means other than [a prisoner's] physical presence before a hearing examiner" does not necessarily mean that the statue unambiguously requires an in-person hearing is well-taken. "Appear" could be inherently ambiguous or have an unambiguous meaning more abstract than an in-person appearance. These amount to essentially the same question: is the meaning of the word "appear" abstract enough–call it ambiguous or unambiguous on an abstract level–to accommodate videoconferencing? The government points us to *United States v. Thompson*, 281 F.3d 1088 (10th Cir. 2002), where the court held that computer files counted as "items" under the statute even though it had been enacted in 1992, prior to the proliferation technology that made possible mass computer-stored child pornography. *Id.* at 1091-92. Yet, computer files individually counted as "items" because they were electronically equivalent versions of physical units of storage. *Id.* Suppose, for the purpose of illustration, that future technology allowed for what we would have understood in 1976 to be an in-person hearing but with all of the participants' bodies in different physical locations. If such a technology allowed for a hearing with *no qualitative difference* from an in-person hearing as we understood it in 1976, then a procedure that employed such a technology would be permissible under the statute even though Congress never contemplated that possibility in 1976. Using the permissible future technology, a person could appear–not just have their face appear–at a place equivalent to a physical place–not at a telephone number. However, the government does not argue that videoconferencing is equivalent to an in-person hearing because it simply is not. Rather, Congress's understanding of how parole hearings could be conducted in 1976 informs our understanding of what "appear" requires of a proceeding, and influenced its creation of the statutory scheme of parole that allowed a prisoner to "appear at" a proceeding held at a "place," both of which increase the degree of specificity with which we understand "appear." Put differently, when we hold that

the statute requires an in-person hearing, we mean that the statute unambiguously requires particular characteristics in a hearing which videoconferencing does not have.

Even if the statute unambiguously required an in-person hearing in 1976, subsequent re-enactment of the statute, most recently in 2008, might require re-interpretation of the statute based on our present-day understanding of "appear." In *National Lead Co. v. United States*, 252 U.S. 140 (1920), the Supreme Court held that "[t]he re-enacting of the drawback provision four times, without substantial change, while this method of determining what should be paid under it was being constantly employed, amount[ed] to an implied legislative recognition and approval of the executive construction of the statute" because "Congress is presumed to have legislated with knowledge of such an established usage of an executive department of the government." *Id.* at 146. Here, Congress extended the life of the Commission five times from 1990 to 2008.[14] To conclude implied Congressional intent to adopt videoconferencing procedures into the parole statutory scheme would require divining Congressional will from the combined fact that the Commission instituted videoconferencing for parole in 2004 and Congress extended parole in 2005 and 2008. Nothing in the text of those extensions gives an indication of Congressional awareness of videoconferencing much less a desire to enact it into the statutes. We do not find any evidence in the legislative history of those re-enactments which might "suggest that Congress was even aware of the [agency's] interpretive position," nor did the parties present any such evidence to us. *Officemax, Inc. v. United States*, 428 F.3d 583, 596 (6th Cir. 2005) (citing *Brown*, 513 U.S. at 121). In other words, videoconferencing must have become such "established usage" between 2004 and 2008 that we could infer Congressional intent to incorporate it into parole without any other indication of such

---

[14]The statute abolishing parole provided that parole would last until 1992 for those who committed offenses prior to November 1, 1987. First, the Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089 (Jan. 23, 1990), extended federal parole for those persons until 1997. Second, the Parole Commission Phaseout Act of 1996, Pub. L. No. 104-232, 110 Stat. 3055 (Jan. 3, 1996), extended it until 2002. Third, fourth, and fifth, the 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, 116 Stat. 1758 (Nov. 2, 2002), the United States Parole Commission Extension and Sentencing Commission Authority Act of 2005, Pub. L. No. 109-76, 119 Stat. 2035 (Sept. 29, 2005), and the United States Parole Commission Extension Act of 2008, Pub. L. No. 110-312, 122 Stat. 3013 (Aug. 12, 2008), respectively, extended parole from 2002 to 2005, 2005 to 2008, and 2008 to 2011.

intent.  In *National Lead*, the executive's construction of the provision at issue had essentially existed since 1861 up until the petition in the case was filed, which occurred around 1920, 252 U.S. at 146, a much more well-established understanding of a statute when compared with the four years at issue in this case, one year of which was a pilot year for the program.

Moreover, re-enactment doctrine has been limited such that "where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction."  *Officemax*, 428 F.3d at 596 (quoting *Brown*, 513 U.S. at 121).  The Court in *National Lead* was dealing with an "indefinite if not ambiguous" statute which "called for construction by the [Secretary of the Treasury]."  252 U.S. at 143-45 ("the drawback due thereon shall be paid to the manufacturer, producer or exporter 'under such regulation as the Secretary of the Treasury shall prescribe'").  18 U.S.C. § 4203(a)(1) calls on the Commission to "promulgate rules and regulations establishing guidelines for the powers enumerated in subsection (b) of this section and such other rules and regulations as are necessary to carry out a national parole policy and the purposes of this chapter."  "[S]ubsection (b)" makes no mention of the way parole hearings are conducted.  *See id.* § 4203(b).  The general dictate to "carry out [] national parole policy" must be subordinate to the specific statutory order that a prisoner be allowed to "appear and testify at" his parole proceeding which is definite and unambiguous.  *Id.* § 4208(e).  By comparison, the statute in *National Lead* provided for a drawback, but did not specifically provide for how that would be calculated, 252 U.S. at 144-45, while our case presents a statute that provides for a parole proceeding and requires that government to allow the prisoner to "appear and testify at" the proceeding.  Put differently, the re-enactment doctrine does not apply when a statute meets *Chevron* step one for lack of ambiguity–which this statute does–such that Congressional inaction coupled with contrary agency action will not abrogate express Congressional intent.  In short, the general rule requires Congress to amend a statute to change its meaning if the statute's meaning is unambiguous when enacted, and we see no reason to deviate from that rule here.

III.    Due Process

Because conducting parole determination proceedings via videoconferencing violates 18 U.S.C. § 4208(e), it is invalid; therefore, we need not reach the issue of whether videoconferencing violates due process.

**CONCLUSION**

The statute unambiguously required an in-person parole proceeding when Congress enacted it in 1976. Congress never acted to change the statute to allow videoconferencing. For the foregoing reasons, we affirm the judgment of the district court.