GINSBURG, Senior Circuit Judge,
dissenting:
An axiom of statutory interpretation is that “unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning .. at the time Congress enacted the statute.” Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). Today this- Court departs from this principle to redefine “smoking” from conventional tobacco consumption, as it was, commonly understood in 1987, to prohibit the use of electronic cigarettes, a new technology with a substantially different nicotine delivery process and likely different, secondhand effects as well. Just as some people will, no doubt, “find ambiguity even in a ‘No Smoking’ sign,” Int'l Union v. Gen. Dynamics Land Sys. Div., 815 F.2d 1570, 1575 (D.C. Cir. 1987), the Court manufactures ambiguity from the lack of a statutory definition and some abstract dictionary definitions of “smoking?’ even though the Congress that adopted the statute and the public it represented would have found the term unambiguous when relating to passenger aviation.
Just as historical understandings define the meaning of statutory terms,’whether terms are ambiguous is determined as of the time when the Congress passed the law. See Terrell v. United States, 564 F.3d 442, 449 (6th Cir. 2009). Subsequent changes in society, technology, or the English language do not alter the meaning of a statute. For example, the Supreme Court held in 2004 that sand and gravel in Nevada were not “valuable” minerals under the Pittman Act of 1919 even though development of the region in the intervening 85 years had made those commodities commercially exploitable. BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183-85, 124 S.Ct. 1587, 158 L.Ed.2d 338 (plurality opinion); id. at 187-89, 124 S.Ct. 1587 (Thomas, J. concurring) (reaching same. conclusion as the plurality because sand and gravel in Nevada lacked a “commercial purpose” at the time. of enactment). . Likewise, the Court has said gaseous.methane was not “coal” “reserv[ed] to the United States”, in government land grants, even.though advances in scientific knowledge later determined the gas was a commercially valuable part of the coal itself. Amoco Prod. Co. v. S. Ute Indian Tribe, 526 U.S. 865, 870, 872-75, 119 S.Ct 1719, 144 L.Ed.2d 22 (1999). Following the Supreme Court’s lead, the courts of appeals have similarly refused to depart from the original meaning of statutory terms notwithstanding subsequent changes in technology and the law. See Terrell, 564 F.3d at 451-52 (reading “appear” to require an in-person appearance at a parole hearing because videoconferencing was not technologically feasible at the time of enactment); Texas v. United States, 497 F.3d 491, 503-04 (5th *922 Cir. 2007) (rejecting the proposition that “a judicial decision can, ex post facto, create a Chevron-type ‘gap’ that introduces ambiguity into the operation of a statutory scheme”). United States v. Brune, 767 F.3d 1009, 1022 (10th Cir. 2014) (holding a statute does not criminalize Internet access because the medium would not have been considered “any other material that contains an image of child pornography” at the time of enactment in 1996); McDonald v. Sun Oil Co., 548 F.3d 774, 779-81 (9th Cir. 2008) (holding the Comprehensive Environmental Response, Compensation, and Liability Act preempts both “statutes of repose” and, as stated in the text, “statutes of limitations” because those terms were used interchangeably when enacted in 1986 even though they are now considered “distinct legal concepts”), abrogated by CTS Corp. v. Waldburger, — U.S. —, 134 S.Ct. 2175, 2185-87, 189 L.Ed.2d 62 (2014) (analyzing those terms as they were understood in 1986 but reaching a different conclusion for other reasons).
The Court resists the historical meaning of “smoking” in two ways. First, it holds the term “smoking” was always understood more broadly than conventional tobacco combustion. As evidence, the Court points to dictionary definitions of “smoke” and “smoking” from the 1980s, which it construes to cover e-cigarette usage. True, e-cigarettes might fit within these definitions if one squints hard enough, but as the Court itself notes “[w]e cannot just tally the dictionary definitions,” Ct. Op. 916, because “[ajmbiguity is a creature not of definitional possibilities but of statutory context,” Brown v. Gardner, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994). See also U.S. Fid. & Guar. Co. v. First State Bank & Trust Co., 125 F.3d 680, 684 (8th Cir. 1997) (cited by Ct. Op. 916) (disagreeing with “appellants’ definition of the term ‘smoke’ because a term’s ordinary meaning is derived from the interpretation of lay persons rather than the definition provided in a dictionary”). That context—a ban on “smoking” on passenger flights— overwhelmingly confirms the narrow scope of the prohibition in § 41706.
What “smoking” meant in 1987 with respect to passengers on airplanes is beyond doubt, inasmuch as e-cigarettes did not then exist. But like the Court, one could stretch dictionary definitions to apply to a wide range of activities no one would have understood the ban to cover at the time. For example, if one defines “smoke” as “the action of heat on moisture,” Ct. Op. 916 (quoting Webster’s Third New International Dictionary 2152 (1981)), and “smoking” as “to emit ... smoke,” Encyclopedia Britannica (1988), then the steam (“to emit ... smoke”) from hot coffee (“the action of heat on moisture”), which was served on airplanes in the 1980s, could also fall within the ban. Likewise a breath-freshening spray (to “inhale (and expel again) the fumes,” Ct. Op. 916 (quoting 15 Oxford English Dictionary 802 (2d ed. 1989)), of “[a] suspension of solid or liquid particles in a gas,” Webster’s Third 2152 (1981) (quoted by the Department)), could be similarly prohibited. Each interpretation would have been just as absurd in the 1980s as it is today, yet each follows from a creative use of dictionary definitions. Although prohibiting a wholly new product, e-cigarettes, may make more sense to modern passengers, the sentiment of today says nothing about whether the activity was “smoking” in the 1980s, when e-cigarettes did not exist.
The Court’s second theory about the broad meaning of “smoking” suffers from a similarly anachronistic mindset. To wit, the Court cites industry characterizations of e-cigarettes as being for one’s “smoking pleasure.” Ct. Op. 916-17 (quoting Sottera, Inc. v. FDA, 627 F.3d 891, 893 (D.C. Cir. 2010) (stating in dicta that e-cigarette liquids are “tobacco products” “derived from tobacco” and regulated under the Tobacco *923 Act but not deciding whether their use is “smoking”)). It also points to several states that have recently extended statutory bans on “smoking” to prohibit e-cigarettes in addition to conventional tobacco. On the first point, contemporary industry marketing efforts alone cannot determine the meaning of a statutory term adopted 30 years ago. Were that the case, an industry could opportunistically characterize its products to fall either inside or outside of a regulatory scheme, undermining the purpose of the statute.
On the second point, the Court is correct that some states have amended their statutory bans to cover e-cigarettes.[1] But in each state cited, the legislature, not an executive agency, amended the statutory prohibition, exercising legislative power it undoubtedly possessed. If the Congress had taken the same action, which it has considered but not done, Ct. Op. 917 (citing H.R. 636, 114th Cong. § 5030 (as passed by the Senate, Apr. 19, 2016); H.R. 3840, 114th Cong. § 2 (2015)), then there would be no serious question of the Department’s authority, but absent legislative action or an alternative source of regulatory authority,[2] I cannot accept the Court’s ahistorical reinterpretation of a purportedly ambiguous statutory term that was well-understood when enacted in 1987.

I respectfully dissent.

. Other states, however, have not. See Va. Op. Att’y Gen. Op. No. 10-029 (Apr. 27, 2010); Arte. Att’y'Gen. Op. No. 114-004 (R14-012), (July 30, 2014); Kan. Att’y Gen. Op. No. 2011-015 (Oct. 31, 2011).

. The Department also argued the Rule can be upheld under its authority to require "safe and adequate” service in passenger aviation. See 49 U.S.C. § 41702. As the Court correctly notes, this authority extends only to domestic air carriers, unlike the statutory ban on "smoking,” which also applies to international flights. Because the Court affirmed the ban on the latter, broader ground, I have no cause to address whether it could have been justified on the narrower “safe and adequate” theory. For this reason, I do not address Parts III through V of the Court’s opinion on procedural irregularities in the rulemaking, which are relevant only to the "safe atid adequate” rationale.