**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUHAIR KHATIB,
            *Plaintiff-Appellant,*

            v.

COUNTY OF ORANGE, a political
subdivision; MICHAEL S. CARONA,
an individual; BRIAN COSSAIRT, an
individual,

            *Defendants-Appellees.*

No. 08-56423

D.C. No.
8:07-cv-01012-
DOC-MLG

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
December 9, 2009—Pasadena, California

Filed May 3, 2010

Before: Alex Kozinski, Chief Judge, Stephen S. Trott and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Stephen S. Trott;
Dissent by Chief Judge Kozinski

## COUNSEL

Becki F. Kieffer and Jennifer Mathis, Troutman Sanders, LLP, Irvine, California, for the plaintiff-appellant.

David D. Lawrence and Christina M. Sprenger, Lawrence Beach Allen & Choi, PC, Santa Ana, California, for the defendants-appellees.

---

## OPINION

TROTT, Circuit Judge:

Souhair Khatib sued the County of Orange, California and some of its officials, alleging a violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.* The gravamen of her complaint is that she was required against her Muslim religious beliefs and practice to remove her "hijab," or headscarf, in public while she was held on two occasions between 9:00 a.m. and 4:30 p.m. in an Orange County Superior Court holding cell pending the disposition by the court of her probation violation. The district court dismissed with prejudice her complaint pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that a courthouse holding cell is not an "institution" as defined by RLUIPA. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS

On June 29, 2006, Mrs. Khatib and her husband pleaded guilty to a misdemeanor violation of California welfare law. The Khatibs were placed on probation on condition that they complete thirty (30) days of community service by a date certain. Two days before that date, they appeared in court seeking an extension. However, the court revoked their probation and ordered them held in custody in the courthouse pending disposition later that day of the violation.

When Mrs. Khatib was processed into the courthouse holding cell, officers required over her objection that she remove

her headscarf for security reasons. To do so in this context violated her religious beliefs by forcing her with head uncovered to confront strangers, including men to whom she was not related. As the district court noted, "Appearing in the presence of male non-family members without a hijab is a serious breach of faith and a deeply humiliating and defiling experience." Later that day, the Superior Court Judge returned her to his courtroom, reinstated her probation, gave her additional time to complete her community service, and awarded her one day credit for time served in the "Orange County Jail." She was then returned to the holding area from which she was released later that afternoon.

## DISCUSSION

## I

**[1]** Section 2000cc-1 of RLUIPA is entitled the "protection of religious exercise of institutionalized persons." Section 2000cc-1(a) prohibits any government from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 [of the Prison Litigation Reform Act ("PRLA")." Section 1997 in turn describes in relevant part the term "institution" as follows:

   (1)   The term "institution" means any facility or institution —

  (A)   which is owned, operated, or managed by, or provides services on behalf of any State or political subdivision of a State; and

  (B)   which is —

    . . .

    (ii)   a jail, prison, or other correctional facility; [or]

    (iii)   a pretrial detention facility . . . .

**[2]** We begin by noting that the facility under examination in this case — a courthouse holding cell — is not directly addressed in the statute. Thus, the question here is whether the courthouse holding cell into which Mrs. Khatib was placed qualifies as an institution as defined in § 1997, i.e., "a jail, prison or other correctional facility," or "a pretrial detention facility." We hold on the basis of the text of the statute construed in the light of its purpose that it is not, as we shall explain.[1]

## II

### A.

There are as many different types of lockups in courthouses as there are courthouses. Some are more complex than others, but many are just secure cells immediately adjacent to courtrooms where prisoners await formal proceedings in front of a judge or spend recesses in trials and other proceedings. Such cells typically have no beds and no food service other than cold lunches provided by the detention facility in which they reside. Persons in such cells are not accompanied by any of their personal belongings. The cells themselves are stark, barren, hard, and distinctly utilitarian. Their dual purpose is only (1) to control persons in custody while they are in the process of being delivered from the detention facilities to the courtroom, and (2) to ensure the security of all involved, including the persons themselves as well as judges and courtroom personnel.

---

[1]Khatib also argues that the district court erroneously converted her motion to dismiss into a motion for summary judgment by relying upon materials outside the pleadings. The district court did not convert Khatib's motion into one for summary judgment. Rather, the court relied upon the Grand Jury Reports which contained detailed descriptions of the Orange County detention facilities, including courthouse holding facilities. Those reports were submitted by Khatib and judicially noticed by the court. Therefore, the district court properly relied upon them.

**[3]** A courthouse holding cell is designed to support a courtroom during courthouse daytime hours. Time spent by persons in holding cell custody can be as short as minutes or as long as hours — but not overnight. Such a cell is not a place where persons in custody either reside or are institutionalized. As such, it is not a "correctional facility" in the nature of a jail or a prison. *See Witzke v. Femal*, 376 F.3d 744, 753 (7th Cir. 2004). The purpose of courthouse confinement is not to correct, to punish, to deter, or to rehabilitate, but simply to provide a secure transient environment for persons in custody while they are in the courthouse awaiting trial or other judicial proceedings. In the language of the statute, these persons may be confined *in* a holding cell, but they are not confined *to* it. Accordingly, § 1997(1)(B)(ii) covering "jail[s], prison[s] or other correctional facilit[ies]" is inapposite.

### B.

**[4]** Courthouse holding cells are not "pretrial detention facilit[ies]" either. The term "pretrial detention facility" is not ambiguous; it is a facility where people ordered held in custody pending future court proceedings are sent to reside and to which they are confined in the interim. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) (describing pretrial detention as the "extended restraint of liberty following arrest"). Indeed, the Federal Bureau of Prisons, in listing the various types of prisons it operates, sets forth as a specific category of prisons "Administrative" facilities, which "are institutions with special missions, such as the detention of pretrial offenders." Federal Bureau of Prisons, Prison Types & General Information, http://www.bop.gov/locations/institutions/index.jsp (last visited January 18, 2010) (providing examples of pretrial detention facilities).

**[5]** A courthouse holding cell is a place where prisoners are temporarily held *during* proceedings — there is nothing "pretrial" about them, unless one reads the words "pretrial" and "detention" completely out of context and without a clear

understanding of how the system works. Once inside the courthouse, the prisoner is no longer in a pretrial detention facility, but in the institution of the courthouse itself as part of the judicial branch of government, not the executive. To hold otherwise would be tantamount to holding that the courtroom itself is a "pretrial detention facility" for persons in custody up until the moment that the trial or other proceeding begins. And, the court's discretionary award of *credit* to Khatib for one day served in the "Orange County Jail" does not convert the holding cell facility in the courthouse into the Orange County Jail.

### III

"In interpreting statutes, the court's objective is to 'ascertain the congressional intent and give effect to the legislative will.' " *Pressley v. Capital Credit & Collection Service, Inc.*, 760 F.2d 922, 924 (9th Cir. 1985) (quoting *Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975)). "Legislative intent, however, is not always evident from the plain language of the statute and in that event, the courts must look to legislative history for guidance." *Id.* "As we have repeatedly stated, 'the meaning of language, plain or not, depends on context.' " *Holloway v. United States*, 526 U.S. 1, 7 (1999) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). Given that the object of our attention is not explicitly included in the generic language of the statute, we turn to the Congress for edification.

**[6]** Our conclusion in this case finds solid support in the statements of the co-sponsors of RLUIPA, Senators Orrin Hatch and the late Edward Kennedy. They stated on the official record that the Act covered "persons in prisons, mental hospitals, and similar state institutions," because "[f]ar more than any other Americans, persons *residing* in institutions are subject to the authority of one or a few local officials. Institutional *residents*' right to practice their faith is at the mercy of those running the institution, and their experience is very mixed." 146 Cong. Rec. S7774-01, S7774-S7775 (daily ed.

July 27, 2000) (Joint Statement of Sen. Hatch and Sen. Kennedy) (emphasis added). No one can persuasively argue that a person in a courthouse holding cell is a resident of that facility. We find nothing in the legislative history to suggest otherwise, or that this law was intended to cover persons temporarily in transitional facilities.

Our conclusion in this regard finds confirmation in the context of the law that we interpret, section 1997, which is part of the Civil Rights of Institutionalized Persons Act of 1980. This Act was manifestly designed to cover persons "*residing in State institutions.*" Civil Rights of Institutionalized Person Act House Conference Report, H.R. Conf. Rep. 96-897, at 8-9 (1980), *reprinted in* 1980 U.S.C.C.A.N. 832, 832-33 (emphasis added). We note that Congress described the intended beneficiaries of this Act as the "residents" of the various facilities and institutions covered by the Act.

**[7]** In addition, Congress' decision to incorporate the PLRA's definition of institution into RLUIPA provides support for our conclusion that courthouse holding facilities are not pretrial detention facilities. "Congress enacted [the PLRA] to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In enacting RLUIPA, Congress was similarly concerned about frivolous litigation and the ability of officials to address complaints internally prior to the initiation of litigation. This concern led Congress to incorporate the PLRA's definition of institution into RLUIPA. *See* 146 Cong. Rec. S6678-02 (daily ed. July 13, 2000) (statement of Sen. Kennedy) ("Congress . . . passed the [PLRA], which includes a number of procedural rules to limit frivolous prisoner litigation. Those procedural rules will apply in cases brought under [RLUIPA]."). Frivolous prisoner litigation would be a real threat if RLUIPA's protections were applied to courthouse holding facilities, because stays at those facili-

ties are never longer than twelve hours and so officials would not be afforded the time to address grievances internally prior to the initiation of litigation. Therefore, Congress' decision to apply the PLRA's definition of "institution" into RLUIPA indicates Congress did not intend that the phrase "pretrial detention facility" apply to courthouse holding facilities.

**AFFIRMED.**

---

Chief Judge KOZINSKI, dissenting:

Freud is reported to have said that sometimes a cigar is just a cigar. And a facility used for holding prisoners prior to trial is a pretrial detention facility. The Religious Land Use and Institutionalized Persons Act (RLUIPA) covers prisoners held in certain kinds of institutions—defined to include both correctional facilities (such as prisons and jails) and pretrial detention facilities. Souhair Khatib was held in a facility where prisoners are routinely detained awaiting trial and other court appearances. She was therefore held in a facility covered by RLUIPA and is entitled to its protections. This pretty much sums up the case for me. Everything below is unnecessary and you could easily skip it.

The majority takes a convoluted path to reach the contrary result, but its analysis just proves how wrong they are. For starters, the opinion overlooks the fact that the statute here has its own rules of construction, codified at 42 U.S.C. § 2000cc-3. Among those rules is the following: "This chapter [meaning RLUIPA] shall be construed in favor of a *broad protection* of religious exercise, to the *maximum extent* permitted by the terms of this chapter and the Constitution." *Id.* at § 2000cc-3(g) (emphasis added). Not every law that Congress passes has such a handy guide to interpretation; in fact, very few do. It seems to me that when Congress goes to the trouble of telling us how to construe a statute, and uses such phrases

as "broad protection" and "the maximum extent permitted," we need to pay close attention and do as Congress commands. The Supreme Court routinely relies on such express instructions. *See, e.g.*, *Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 497-98 (1985) (relying directly on the "express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes' "). And some of our nation's hottest jurists have called for their more frequent use. *See, e.g.*, Alex Kozinski, *Should Reading Legislative History Be an Impeachable Offense?*, 31 Suffolk U. L. Rev. 807, 819 (1998) ("[O]ne would hope that Congress would do the next best thing: instruct the courts how to resolve the close cases. This would not usurp the judicial function in any way; it would merely give judges instructions how to go about discovering the statute's fine nuances." (citing Hearings Before the Joint Comm. on the Organization of Cong., 103d Cong., 1st Sess. 81-82 (1993) (statement of Hon. Patricia M. Wald, Judge, D.C. Circuit Court of Appeals))).

The question then is not the usual one when we interpret statutes, namely what is the most plausible construction. Instead, we must ask the following question: Stretching the term "pretrial detention facility" to its maximum limit, does the place where Khatib was incarcerated for several hours possibly fit within that definition?

As if the answer isn't perfectly clear, let's take a stroll through the record and see what we find. In the same document that the majority approves of at page 6592, note 1 (namely the 2006-2007 Orange County Grand Jury Report), we find courthouse holding facilities described as follows:

> COURT HOLDING FACILITY is a secure detention facility located within a court building used for the confinement of persons solely for the purpose of a court appearance for a period not exceeding 12 hours.

Grand Jury Report at 1. I don't need to tug very hard at the corners of "pretrial detention facility" to get it to include a facility fitting this description. But there's more, right in the middle of Orange County's brief:

> The court holding facility is staffed with only [sic] 20 sworn deputies, who are responsible for the daily comings and goings of approximately 600 inmates from the various Orange County Jails. (ER 98.) In addition to inmates from the Orange County Jails, the court holding facility temporarily holds custody of a significant number of persons taken into custody at the courthouse every day. (ER 208.) Moreover, the sworn deputies are responsible for ensuring that the persons in the court holding facility make it through a "labyrinth of sub-basements, tunnel[s], secured elevators, and holding cells . . . one-by-one . . . ." (ER 98.)

Answering Brief at 22-33 (footnote omitted) (alterations in original).

It's pretty clear from this description that the facility in the Santa Ana Courthouse isn't a makeshift cell in the corner of the courtroom, designed to hold the occasional unruly drunk while he waits for the judge, as the majority posits at page 6592-93 of the opinion. The Santa Ana facility is a full-fledged jail with its own permanent staff, schedule and procedures. While the inmates don't sleep there, they are treated pretty much the same as in all correctional facilities, "segregated by race, gang affiliation, criminal level of intensity, and other characteristics to prevent trouble." Grand Jury Report at 4. Note, also, that aside from the central facility itself, there are a number of other secure areas in the courthouse, including "holding cells" dispersed throughout the building. Those holding cells may not themselves be facilities, and thus not covered by RLUIPA, but surely the central facility itself—

where hundreds of inmates are detained every day while waiting to go to court—is a pretrial detention facility.

Is this the best interpretation of the statute? I think so, but it doesn't have to be. Applying RLUIPA's rule of generous construction, we must ask ourselves whether this is a permissible construction if we read the term "to the maximum extent permitted" so as to achieve a "broad protection of religious exercise." Can we honestly say that a mammoth facility in the bowels of the Santa Ana courthouse, whose main purpose is to hold inmates while awaiting trial, cannot possibly be a pretrial detention facility? Is that really like calling a fish a fowl or an elephant a donkey?

But there's more. Just think about what Congress was trying to do when it crafted the definition of institution in section 1997:

> (1) The term "institution" means any facility or institution . . .
>
> > (B) which is . . .
> >
> > > (ii) a jail, prison, or other correctional facility;
> > >
> > > (iii) a pretrial detention facility;
> > >
> > > (iv) for juveniles—
> > >
> > > > (I) held awaiting trial;
> > > >
> > > > (II) residing in such facility or institution for purposes of receiving care or treatment; or
> > > >
> > > > (III) residing for any State purpose in such facility or institution . . . .

> (v)   providing skilled nursing, interme-
> diate or long-term care, or custodial
> or residential care.

42 U.S.C. § 1997. Looking at subsections (ii) and (iii), we see that Congress divided the universe of institutions holding adults caught up in the criminal justice system into two parts: those whose inmates are incarcerated after they've been found guilty; and those whose inmates are incarcerated while awaiting an adjudication of guilt. Congress chose to define facilities in terms of the kinds of inmate they would hold rather than in terms of their physical characteristics such as whether they have beds or bars on the windows. It included all facilities for convicted inmates and all facilities for inmates who are still presumptively innocent, thereby covering the entire universe of facilities holding people who become enmeshed in the criminal justice system. It's hard to imagine how Congress could have spoken more broadly. What would they have had to say to make sure that the Orange County Court's holding facility is covered? Would they have had to mention it by name and zip code?

The majority's contrary arguments only prove my point. The suggestion that "[t]he term 'pretrial detention facility' is not ambiguous," maj. at 6593, and includes only facilities where inmates spend the night, is wrong on its face. The opening provision in the RLUIPA states: "No government shall impose a substantial burden on the religious exercise of a person residing in *or confined to* an institution . . . ." 42 U.S.C. § 2000cc-1(a) (emphasis added). If Congress had meant to include only institutions with beds, there would have been no point in adding "or confined to" following "residing in," would there? More fundamentally, where in RLUIPA does Congress include a residency requirement—one so clear that it absolutely excludes all facilities that don't have beds? I note that elsewhere in the same definition section, the statute refers repeatedly to residency, so Congress surely knew how to say so when it meant to. *See, e.g., id.* at

§ 1997(1)(B)(iv)(II), (iv)(III), (v). Instead of stretching the statute to its maximum limit, as Congress said we should, the majority pulls out of thin air requirements that constrict RLUIPA's plain language. Is this what my colleagues see as "broad protection of religious exercise, to the maximum extent permitted by the terms of" the statute? If so, I'd hate to see what a grudging interpretation looks like.

Nor am I moved by the majority's ex cathedra disquisition about courthouse holding cells generally being "stark, barren, hard, and distinctly utilitarian." Maj. at 6592. I suppose they're quite different from your ordinary jail cell, which comes equipped with flat-screen TVs, mini-bars, iPod docking stations and Frette linens. None of this is in the record, nor is the majority's speculation that "[o]nce inside the courthouse, the prisoner is no longer in a pretrial detention facility, but in the institution of the courthouse itself as part of the judicial branch of government, not the executive." *Id.* at 6594. That the court and the detention facility are housed under the same roof is neither here nor there; it's quite common to have executive agencies housed inside federal courthouses, yet surely no one suggests that the offices of (say) the United States Attorney are "part of the judicial branch of government, not the executive." The grand jury report tells us that Orange County's courthouse holding facilities are in fact under the jurisdiction of the Orange County Sheriff's Department, not the court. **[ER 95, 98]** This is confirmed by the Sheriff's website, which tells us that its "Court Operations Division is committed to protect and serve the judiciary and the public by ensuring a safe environment in the Superior Court of Orange County," which includes "[s]taffing all courthouse holding facilities." Orange County Sheriff's Department, Court Operations Division, http://www.ocsd.org/index.php?option=com_content&view=article&id=130&Itemid=85 (last visited April 22, 2010). This argument, which the majority comes up with on its own, just shows the folly of writing an opinion based on judicial intuition rather than the record and arguments presented by the parties.

But it don't matter anyhow. Even if we assume, contrary to fact and common sense, that the courthouse holding facilities in Orange County are entirely under the jurisdiction of the Superior Court, so what? RLUIPA doesn't exempt facilities operated by courts. The holding facilities are separate units within each courthouse, designated for a specific purpose—holding inmates while they await court appearances. It doesn't matter who runs them; there's no judicial immunity for RLUIPA. The facilities are covered by the statute and who operates them makes no difference.

In a creative effort to find support for its untenable position, the majority tries to rely on the interplay between RLUIPA and the Prison Litigation Reform Act, maj. at 6595-96, but the attempt boomerangs. As I understand the majority's argument, it is that RLUIPA can't apply to courthouse holding facilities because the prisoners aren't there long enough to file grievances under the PLRA to resolve their RLUIPA claims. Maj. at 6595-96. This argument has a simple answer, namely that the PLRA only covers "jail[s], prison[s] or other correctional facilit[ies]." 42 U.S.C. § 1997e(a). Pretrial detention facilities (however defined) are categorically exempt from the PLRA, although they *are* covered by RLUIPA. The interplay between the two regimes actually undermines the majority's position. This is another argument the majority brings up on the fly with no input from the parties. And, once again, the majority gets it wrong.

Finally, the majority seeks refuge in legislative history. Maj. at 6594-05. As the late, great Judge Harold Leventhal said, consulting legislative history is like looking over the heads of a crowd and picking out your friends. Alas, the majority here finds few friends; they're more like cool acquaintances. From the hefty legislative history of RLUIPA, the majority plucks a couple of quotes where Senators Hatch and Kennedy indicate that the primary purpose of the statute is to protect individuals residing in institutions. It is not surprising that a floor statement would focus on the most serious

abuses the law is meant to target, which will almost invariably involve long-term residents of institutions. One wouldn't expect a floor statement to cover every wrinkle of the statute. But nothing the senators say precludes applying the statute to Khatib's case. Keep in mind that we are commanded to read the statute broadly and give it the maximum effect. Do Senators Hatch and Kennedy stand in the way? Certainly not.

Congressman Canady, who is not a friend, gets no wave from the majority, or even a nod. Yet, Canady was one of the bill's co-sponsors in the House and entered a section-by-section analysis into the Congressional Record. This analysis explains that, just like it says, RLUIPA is designed to "protect the religious exercise of persons residing in *or confined to* institutions defined in the Civil Rights of Institutionalized Persons Act." 146 Cong. Rec. E1563-01, E1563 (extension of remarks) (Statement of Congressman Canady) (emphasis added). So much for the conceit that the statute only protects inmates who reside in institutions.

* * *

This is not a hard case. The statute here clearly covers courthouse holding facilities like the one where Souhair Khatib was confined and forced to uncover her head in the presence of men who were not her husband. As the district court recognized—and the majority acknowledges—this is a serious affront to her religious beliefs. I can see no plausible reason why a facility which has a permanent staff of 20 deputies and handles thousands of inmates a week ought to be exempted from RLUIPA. If accommodating an inmate's religious beliefs is too burdensome or inconvenient, defendants need not do so. *See* 42 U.S.C. § 2000cc-1(a). But that is not something we can adjudicate at this stage of the proceedings. All we can decide right now is whether there is any conceivable way that a courthouse holding tank is a pretrial detention facility, as specified in RLUIPA. You don't have to be the White Queen to believe that it is. Freud, Leventhal and Ken-

nedy are looking down on us and shaking their heads in disappointment. We need to reverse and send the case back for trial.