# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 17-0528

HAROLD L. ROBY, JR., APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued July 24, 2018                                     Decided March 19, 2019)

*Ronald L. Smith*, of Washington, D.C., for the appellant.

*Robert Schneider*, with whom *James M. Byrne*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Selket N. Cottle*, Deputy Chief Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before SCHOELEN, BARTLEY, and MEREDITH, *Judges*.

BARTLEY, *Judge*: Veteran Harold L. Roby, Jr., appeals through counsel a November 17, 2016, Board of Veterans' Appeals (Board) decision that denied entitlement to a disability evaluation in excess of 30% for achalasia.[1] Record (R.) at 2-23.[2] This matter was referred to a panel of the Court, with oral argument, to examine the terms "passage" and "liquids" as used in 38 C.F.R. § 4.114, Diagnostic Code (DC) 7203, to evaluate achalasia. For the reasons that follow, the Court will affirm the November 2016 Board decision.

---

[1] This term is defined and discussed in Section I.A. of the decision.

[2] In the same decision, the Board granted entitlement to a 40% disability evaluation for varicose veins of the right leg from October 27, 2011, to September 8, 2014. R. at 13-21. Because this determination is favorable to Mr. Roby, the Court will not disturb it. *See Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007) ("The Court is not permitted to reverse findings of fact favorable to a claimant made by the Board pursuant to its statutory authority."). In addition, the Board denied entitlement to an increased evaluation for varicose veins of the right leg in excess of 10% prior to February 5, 2009; in excess of 20% from February 5, 2009, to October 26, 2011; and in excess of 40% from October 27, 2011. Because Mr. Roby has not challenged these portions of the Board decision, the appeal as to these matters will be dismissed. *See Pederson v. McDonald*, 27 Vet.App. 276, 281-86 (2015) (en banc) (declining to review the merits of an issue not argued and dismissing that portion of the appeal); *Cacciola v. Gibson*, 27 Vet.App. 45, 48 (2014) (same).

## I. BACKGROUND

### A. Esophageal Achalasia

Esophageal achalasia (cardiospasm) is the failure of the smooth muscles of the lower esophageal sphincter[3] to relax with swallowing, thereby causing a narrowing (stricture) of the esophagus and impairing the movement of food along the digestive tract (peristalsis). *See* DORLAND'S at 14, 1418; THE MERCK MANUAL 123 (19th ed. 2011) (MERCK). The primary symptom of achalasia is difficulty swallowing (dysphagia) for both solids and liquids, but other symptoms include regurgitation of undigested food, chest pain, and weight loss. MERCK at 123. Management of achalasia involves diet modification and treatment options aimed at reducing the esophageal stricture. TEXTBOOK OF SURGERY: THE BIOLOGICAL BASIS OF MODERN SURGICAL PRACTICE 715 (19th ed. 1986) (TEXTBOOK OF SURGERY); LAWYERS' MEDICAL CYCLOPEDIA OF PERSONAL INJURIES AND ALLIED SPECIALTIES, Vol. 4 § 30.60b (6th ed. 2013). Treatment options include, among other things, balloon dilation of the lower esophageal sphincter to expand the gastroesophageal opening. TEXTBOOK OF SURGERY at 715-16.

### B. Evaluating Esophageal Achalasia

The Schedule for Rating Disabilities provides three DCs for esophageal disabilities; two are related to evaluating achalasia. Achalasia is evaluated under DC 7204, which contemplates spasm of the esophagus (cardiospasm). 38 C.F.R. § 4.114 (2018). If the achalasia is not amenable to dilation, DC 7204 directs that the disability is to be evaluated based on the degree of obstruction under DC 7203, which contemplates esophageal stricture.[4] *Id*.

Under DC 7203, a 30% evaluation is provided when the severity of the stricture is "[m]oderate." *Id*. A 50% evaluation is provided when the severity of the stricture is "[s]evere, permitting liquids only." *Id*. An 80% evaluation is provided when the severity of the stricture is such that it results in "[p]ermitting passage of liquids only, with marked impairment of general health." *Id*.

---

[3] The lower esophageal sphincter is located where the esophagus meets the stomach (the gastroesophageal junction). DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1746 (32d ed. 2012) (DORLAND'S).

[4] Although achalasia often results in stricture of the esophagus, esophageal stricture may result from other causes and may be either permanent (structural) or temporary (functional). *See* DORLAND'S at 1785.

## C. Facts and Procedural History

Mr. Roby served on active duty in the U.S. Army from July 1975 to July 1992, including service in Southwest Asia. R. at 159, 1129. In October 1993, a VA regional office (RO) granted service connection for achalasia and assigned an initial 30% disability evaluation under DC 7203. R. at 1319-23.

In November 2009, Mr. Roby filed a claim for an increased evaluation for achalasia. R. at 1012. Upon VA examination in December 2009, Mr. Roby reported "very mild dysphagia[,]" occurring at times," but no heartburn and no weight loss. R. at 963. In January 2010, the RO continued the 30% evaluation for Mr. Roby's achalasia. R. at 674-84. In June 2010, Mr. Roby filed a Notice of Disagreement, R. at 563, and in January 2011, he perfected an appeal to the Board, R. at 500.

A January 2011 VA treatment record reflects that Mr. Roby reported that his esophagus was "getting tight again [with] choking." R. at 468. The clinician referred Mr. Roby to a gastrointestinal specialist. *Id*. In February 2011, Mr. Roby underwent an esophagogastroduodenoscopy (EGD) with dilation. *See, e.g.*, R. at 343-45. A May 2011 VA gastroenterology note reflects that Mr. Roby reported "[n]o further difficulty with dysphagia." R. at 136.

Upon VA examination in October 2011, Mr. Roby reported pain in his esophageal area after eating, blockage of food, and frequent regurgitation of food from the day before in gelatinous form. R. at 343. He reported multiple dilation procedures, most recently in February 2011, but that he received symptom relief for at most only the three months following each dilation. R. at 343-45. Following examination, the examiner indicated the severity of Mr. Roby's achalasia was moderate due to consistent symptoms of pain and regular blockage of food; the examiner noted no dysphagia with liquids. R. at 347. Finally, the examiner noted that Mr. Roby's achalasia affects his employment because six times a month he must leave workplace conversations to perform 10 to 15 minutes of exercises to encourage relaxation of the esophageal musculature. R. at 353.

A November 2012 VA treatment record reflects that Mr. Roby reported food moving slowly down his esophagus with blockage. R. at 1442. The clinician noted Mr. Roby's history of esophageal stricture and referred him to a gastrointestinal specialist. R. at 1443. In February 2013, Mr. Roby underwent another EGD due to solid and liquid dysphagia. R. at 1429-30. The

gastroenterologist recommended against dilation and noted that Mr. Roby's symptoms were likely due to absent motility (peristalsis). *Id.*

An April 2013 VA gastroenterology treatment record reflects that Mr. Roby reported dysphagia three times per week to solid foods slightly greater than liquids. R. at 1425. He reported eating small quantities of food at a time and having to chew very carefully, but that he "does not limit food." *Id.* He further reported occasional blockage of food and heartburn symptoms controlled with medication, but no weight loss. *Id.* Given Mr. Roby's history of improved symptoms with dilation, the gastroenterologist recommended another dilation and, if beneficial, repeat dilation as needed. R. at 1427.

During a May 2014 Board hearing, Mr. Roby testified that he has difficulty swallowing solid foods and must take small (dime-sized) bites or eat mostly soft foods. R. at 1396-97. Specifically, he testified that a typical day would include a diet of applesauce, yogurt, mashed potatoes, chicken, and baby food, but that he avoids foods such as breads or fresh fruit. R. at 1400-01. However, he reported recurrent blockage of food and having to chew foods "small enough to where it would be [of] liquid consistency" before swallowing. R. at 1397; *see* R. at 1401.

Upon VA examination in September 2014, Mr. Roby reported dysphagia to solid foods but not to liquids since his last dilation in 2011. R. at 68. He stated that it can take up to 15 minutes for solid foods to pass through his esophagus, but that he must chew them for a long time or raise both arms to aid in swallowing. *Id.* He described a typical day of eating as eating three meals: applesauce and yogurt for breakfast, half a sandwich for lunch, and chicken for dinner. *Id.* He added that he drinks juice and eats soup throughout the day. *Id.* The examiner noted that Mr. Roby responds well to dilations with decreased symptoms of dysphagia. *Id.* The examiner noted symptoms of infrequent episodes of epigastric distress, dysphagia, and pyrosis (heartburn) and provided an overall assessment of the severity of Mr. Roby's achalasia as moderate. *Id.*

In the November 2016 decision on appeal, the Board denied entitlement to an evaluation in excess of 30% for achalasia. R. at 1-21. The Board found that "[a]t no time has [Mr. Roby] complained, or does the evidence show, that his esophageal stricture is severe, permitting liquids *only*." R. at 10 (emphasis in original). The Board noted that the evidence demonstrated that Mr. Roby "is able to consume food, albeit with difficulty" and there is no indication of an overall impairment in his health. R. at 11. This appeal followed.

4

## II. ARGUMENTS[5]

Mr. Roby argues that the Board erred in denying him a higher evaluation for achalasia when it "read an express limitation" into the criteria for higher evaluations that is contrary to the clear and unambiguous language of DC 7203. Appellant's Br. at 9-10; Reply Br. at 4. Specifically, he argues that the term "liquid" is clear and should be afforded its ordinary definition, meaning a substance that flows readily in its natural state, Oral Argument at 4:15-4:51; 5:40-6:07; 11:22-12:04; 14:00-14:44, or a fluid with no independent shape, *id.* at 53:47-54:30. He argues that the Board erred in its interpretation of DC 7203 by requiring that foods be in liquid state when they enter the mouth to satisfy an evaluation higher than 30%. Appellant's Br. at 9-12; Reply Br. at 3-4; Oral Argument at 3:48-4:15; 15:25-16:23. He contends that he satisfies the criteria for a 50% evaluation because his diet is limited to foods that meet the ordinary definition of liquid, including applesauce, baby food, yogurt, and mashed potatoes, *see* Oral Argument at 7:20-7:54 (stating that these foods are liquids because they "will flow naturally" down a 45-degree angle), as well as solid foods that he chews to a "'liquid consistency,'" which he equates to the ordinary definition of liquid, Reply Br. at 4; *see* Oral Argument at 7:54-8:45; 18:55-20:45. In the alternative, he argues that, if the language of DC 7203 is ambiguous, the Board's interpretation is not permissible because it is contrary to the regulatory language and not veteran friendly. Appellant's Br. at 11-12; Reply Br. at 3-4.

The Secretary also argues that the regulatory language of DC 7203 is clear and unambiguous. Specifically, he argues that the term "liquid" is clear and is defined as a substance that flows freely, of constant volume, having the consistency like that of oil or water. Secretary's Br. at 12-13; Oral Argument at 28:10-28:44; 46:57-47:12; 49:59-52:53. Additionally, he acknowledges that the terms "permitting" and "permitting passage" refer to the state of the food as it passes through the esophagus, not the mouth, even though he argues that the vast majority of foods will not change states between the mouth and the esophagus, despite Mr. Roby's arguments to the contrary. Oral Argument at 35:56-38:18; 41:25-42:04; *see* Secretary's Br. at 12-17. He further argues that none of the foods specifically identified by Mr. Roby fit the definition of "liquid" as there is a distinction between liquids and chewed solid food, soft solid foods, and

---

[5] At oral argument, Mr. Roby conceded that he is not entitled to an evaluation in excess of 30% prior to May 2014 but argued that his testimony during the May 2014 Board hearing reflected an increase in the severity of his achalasia. Oral Argument at 1:51-2:08, *Roby v. Wilkie*, U.S. Vet. App. No. 17-0528 (argued July 24, 2018), http://www.uscourts.cavc.gov/oral_arguments_audio.php.

purees. Secretary's Br. at 12-17; Oral Argument at 43:57-44:05; 45:13-45:46; 46:57-47:12. Finally, the Secretary argues that the Board did not interpret DC 7203, but instead applied DC 7203 based on a plain reading of the regulatory language. Secretary's Br. at 11-15. He argues that, even if the Board did interpret DC 7203, Mr. Roby has not demonstrated how the Board's interpretation was arbitrary or capricious. *Id*. at 16-17.

In addition to the arguments relating to the Board's purported interpretation of DC 7203, Mr. Roby advances two other arguments. First, he argues that the Board exceeded its jurisdiction by interpreting DC 7203 in the first instance, thereby depriving him the right to one review on appeal. Appellant's Br. at 12-13. Second, he argues that the Board did not consider the applicability of 38 C.F.R. § 4.7 and whether the severity of his achalasia more closely approximated the criteria for a 50% evaluation. *Id*. at 14-15; Reply Br. at 4-5.

In addressing Mr. Roby's other arguments, the Secretary contends that the Board did not exceed its jurisdiction because, even if the Board's analysis could be considered an interpretation of DC 7203, then the RO similarly "interpreted" that regulation. Secretary's Br. at 17-18. Further, he argues that the Board properly considered § 4.7 in finding that Mr. Roby was not entitled to a higher evaluation. *Id*. at 19 (citing R. at 7, 11). Finally, he argues that a plausible basis for the Board's determination exists in the record and Mr. Roby fails to demonstrate prejudice for any purported errors, as the evidence of record does not establish that his achalasia is severe, permitting liquids only. *Id*. at 9-10.

### III. ANALYSIS

This case primarily involves answering two questions regarding the regulatory language of DC 7203: (1) Does "permitting" and "[p]ermitting passage," as used in the 50% and 80% evaluation criteria of DC 7203, refer to passage through the esophagus or passage into the mouth and oral cavity? and (2) What does "liquids" mean as used in the 50% and 80% evaluation criteria in DC 7203? 38 C.F.R. § 4.114. We therefore begin our analysis with an examination of the regulatory language. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute [or regulation] is its language."); *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015) ("Regulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure."); *see generally Southall-Norman v. McDonald*, 28 Vet.App. 346, 351 (2016). If the plain meaning is clear from

the language of the regulation, then that meaning controls and "that is 'the end of the matter.'" *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)); *see Pacheco v. Gibson*, 27 Vet.App. 21, 25 (2014) (en banc). If, however, the language is ambiguous, then the Court must defer to the agency's interpretation of its regulation unless that interpretation is inconsistent with the language of the regulation, is otherwise plainly erroneous, or does not represent the agency's considered view on the matter. *Southall-Norman*, 28 Vet.App. at 351; *see Auer v. Robbins*, 519 U.S. 452, 461-62 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *Smith v. Nicholson*, 451 F.3d 1344, 1349-50 (Fed. Cir. 2006).

A. The Meaning of "Permitting" and "Permitting Passage" in DC 7203 is Clear

Diagnostic Code 7203 specifically refers to stricture of the esophagus and provides varying evaluations based on the severity of the stricture. 38 C.F.R. § 4.114. Notably, higher evaluations are provided for a greater degree of esophageal narrowing (i.e., moderate or severe) and for an inability to pass anything but liquids.[6] *Id*. Based on the structure of the DC, it is clear that the general focus in assessing a veteran's esophageal stricture disability is not determining what may be placed in the mouth (a part of anatomy not mentioned in the DC), but instead determining what may pass through the esophagus. Although the Secretary may be correct that, with the vast majority of substances, whether it is a liquid will remain the same between the mouth and esophagus, in cases where there is a difference, DC 7203 clearly refers to the state when the substance passes through the esophagus. Therefore, the Court concludes that the meaning of "permitting" and "[p]ermitting passage" is clear from the plain language of DC 7203 and refers to passage through the esophagus.

B. The Meaning of "Liquids" as Used in DC 7203 is Ambiguous

Moving on to the definition of "liquids" in DC 7203, we note that this appeal centers around certain foods that Mr. Roby consumes—namely applesauce, baby food, yogurt, and mashed potatoes—and whether those foods would satisfy the requirement for a 50% evaluation. Both parties agree that the meaning of "liquids" as used in DC 7203 is clear and unambiguous on its face. They both agree that the term "liquids" should be afforded its ordinary meaning, and both cite to dictionaries to proffer similar definitions. *See, e.g., Nielson v. Shinseki*, 23 Vet.App. 56, 59

---

[6] Under DC 7203, a 30% evaluation is provided for a stricture of "moderate" severity and a 50% evaluation is provided for a stricture that is "severe, permitting liquids only." 38 C.F.R. § 4.114. An 80% evaluation, in addition to requiring a stricture "[p]ermitting passage of liquids only," also requires a showing of "marked impairment of general health." *Id*.

(2009) ("It is commonplace to consult dictionaries to ascertain a term's ordinary meaning."). At oral argument, Mr. Roby offered two definitions. First, relying on *Dorland's*, he defined a liquid as a substance that flows readily in its natural state that is neither a solid nor a gas. Oral Argument at 4:15-5:01, 5:14-5:21; *see* DORLAND'S at 1065. Second, relying on *Webster's Dictionary*, he defined liquid as a fluid, such as water, that has no independent shape but has a definite volume, does not expand indefinitely, and is only slightly compressible. Oral Argument at 5:22-5:36; *see* MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/liquid (noun definition 2) (last accessed March 19, 2019). Similarly, the Secretary, relying on the *Oxford Living Dictionary*, defined liquid as a substance that flows freely but is of constant volume, having a consistency like that of water or oil. Secretary's Br. at 12-13; *see* OXFORD LIVING DICTIONARY, https://en.oxforddictionaries.com/definition/liquid (noun definition 1) (last accessed March 19, 2019).

Although both parties rely on different dictionaries to proffer definitions of "liquids," their respective definitions are quite similar. These definitions reflect the basic principle that liquids are substances that are neither solid nor gas. More specifically, liquids, like solids and unlike gases, have a definite and fixed volume. In contrast, liquids, like gases and unlike solids, do not have an independent shape, meaning they flow freely and take the shape of their container.[7]

Although these definitions provide a clear distinction between solids and liquids,[8] there are other regulatory terms that may be relevant to determining whether "liquids" is ambiguous, such as purees, soft solids, and semisolids. *See, e.g.*, 38 C.F.R. § 4.150, DC 9905, Note (3) (2018) (criteria for evaluating temporomandibular disorder disabilities); 76 Fed. Reg. 39160, 39162 (Jul. 5, 2011) (proposed rule to amend, in part, DC 7203, which was withdrawn by 77 Fed. Reg. 27009 (May 8, 2012)). The parties differ as to whether applying their respective definitions of a liquid to those other terms clearly reveals which substances constitute liquids under DC 7203. Specifically,

---

[7] Compare the definitions of the terms "solid," "liquid," and "gas" found in the general reference dictionaries cited by the parties. *Compare* Liquid, https://en.oxforddictionaries.com/definition/liquid (noun definition 1) *and* https://www.merriam-webster.com/dictionary/liquid (noun definition 2), *with* Solid, https://en.oxforddictionaries.com/definition/solid (noun definition 1, adjective definition 1) *and* https://www.merriam-webster.com/dictionary/solid (noun definition 2a), *with* Gas, https://en.oxforddictionaries.com/definition/gas (noun definition 1) *and* https://www.merriam-webster.com/dictionary/gas (noun definition 1) (all last accessed March 19, 2019).

[8] Because the relevant focus here deals with whether substances are liquids under DC 7203, the Court's analysis is limited to determining the regulatory definition of liquids in comparison only to solids and without consideration of the differences between liquids and gases.

Mr. Roby argues that if a food is not solid, then it is, by default, liquid. He, therefore, frames the relevant distinction as solid food versus non-solid food. In contrast, the Secretary argues that the proper distinction is liquid food versus non-liquid food. It is this disagreement that lies at the center of this appeal.

The Court is unable to discern a plain meaning of the term "liquids" from the text, structure, or purpose of DC 7203. There is no indication from the plain language of DC 7203 whether the definition of liquids should be interpreted as broadly as Mr. Roby argues or as narrowly as the Secretary argues. The regulation does not provide a definition of "liquids" and the Secretary has not identified a definition proffered by VA in the Rating Schedule, regulatory guidance, or adjudicative manuals. Although the structure of DC 7203 reflects that the purpose is to provide higher evaluations for a greater degree of esophageal narrowing and for an inability to pass anything but liquids, it does not indicate what particular substance or substances may be considered a liquid.

In addition, there is no regulatory history available for the Court to glean how the term liquid should be interpreted. When VA first published the Schedule for Rating Disabilities in the Federal Register, which it did without commentary, DC 7203 utilized the exact same language that exists today. *See* 29 Fed. Reg. 6718 (May 22, 1964); *compare* 38 C.F.R. § 4.114, DC 7203 (1964), *with* 38 C.F.R. § 4.114, DC 7203 (2018). Moreover, the exact same language was used when DC 7203 was incorporated into the Rating Schedule, effective April 1, 1946. *Compare* 38 C.F.R. § 4.114, DC 7203 (1946), *with* 38 C.F.R. § 4.114, DC 7203 (2018).

Without a clear meaning from the plain language or guidance from the regulatory history, the Court concludes that the regulatory language of DC 7203 is ambiguous with respect to application of the ordinary definition of liquid to the substances that fall in between pure liquid and pure solid. *See Smith*, 451 F.3d at 1350-51; *Tropf*, 20 Vet.App. at 321 n.1 (finding ambiguity "when the application of the ordinary meaning of words and rules of construction to the plain language of the regulation fails to answer the question at issue"); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.").

As the regulatory language is ambiguous, the Secretary's interpretation will be afforded deference so long as it is not plainly erroneous or inconsistent with the regulation, and when there is no reason to suspect that it does not reflect fair and considered judgment on this matter. *See*

*Auer*, 519 U.S. at 462; *Smith*, 451 F.3d at 1350-51; *Pacheco*, 27 Vet.App. at 26. The Court concludes that the Secretary's interpretation is neither plainly erroneous nor inconsistent with the regulation, and is reflective of his fair and considered judgment.

The Secretary's interpretation—that the ordinary definition of "liquids" does not include foods that have a textural quality like purees, soft solids, semisolids, or chewed solids—is neither plainly erroneous nor inconsistent with DC 7203. His interpretation comports with the ordinary definition of "liquids"; is consistent with the regulatory scheme of DC 7203, which provides higher evaluations based on greater difficulty swallowing; and aligns with the aim of the regulation. *See Martin v. Occupational Safety and Health Review Com'n*, 499 U.S. 144, 150-51 (1991); *see also Decker v. Northwest Environmental Defense Center*, 568 U.S. 597, 613 (2013) ("It is well established that an agency's interpretation need not be the only possible reading of a regulation— or even the best one—to prevail.").

The Secretary's interpretation also appears to reflect his fair and considered judgment. Notably, his interpretation is consistent with other instances when he has interpreted "liquid" as it relates to food. In July 2011, the Secretary proposed to overhaul that portion of the Schedule for Rating Disabilities pertaining to digestive disabilities. 76 Fed. Reg. 39,160 (Jul. 5, 2011). At that time, VA proposed to evaluate disabilities of the mouth, lip, tongue, and esophagus under a general rating formula, based, in part, on the degree of a veteran's dietary restrictions. *Id*. at 39,161-63, 39,178. Although the need for the proposed revision was based, in part, on the subjectivity of the terms "moderate," "marked," and "severe" and not on any perceived subjectivity in the term "liquids," the proposed criteria differentiated between "liquid foods" and "soft solid foods" and provided higher evaluations where a disability precluded eating soft solid foods but not liquid foods. *Id*. Although the Secretary ultimately withdrew the proposed regulatory changes, *see* 77 Fed. Reg. 27,009 (May 8, 2012), the distinction between "liquid foods" and "soft solid foods" is consistent with his current interpretation of "liquids" that makes the same distinction.

The Secretary also made a similar distinction when he amended 38 C.F.R. § 4.150, DC 9905, which contemplates temporomandibular disorders. *See* 80 Fed. Reg. 44,913, 44,915-17 (Jul. 28, 2015). As relevant, the rating criteria, which are based on criteria established by the Academy of Nutrition and Dietetics, contemplate varying levels of texture-modified diets and define four levels of mechanically altered foods: full liquid, puree, soft foods, and semisolid foods. *Id*. at

44,918; *see* 38 C.F.R. § 4.150, DC 9905, Note (3) (2018).[9] Although the Secretary's differentiation of texture-modified foods is not found in the language of DC 7203, his current interpretation of "liquids" as excluding purees, soft solids, and semisolid foods is consistent with DC 9905, which provides evaluation criteria addressing a similar functional impairment; namely both diagnostic codes contemplate a disability necessitating a texture-modified diet. *See Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) ("In construing regulatory language, we must read the disputed language in the context of the entire regulation as well as other related regulatory sections in order to determine the language's plain meaning.").

Although not absolute, "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932); *see Gardner*, 513 U.S. at 118; *Prokarym v. McDonald*, 27 Vet.App. 307, 310 (2015). Mr. Roby has offered no persuasive argument as to why liquid should be interpreted more broadly in DC 7203 than in DC 9905. *See* Oral Argument at 16:25-18:21. Therefore, the Court concludes that the Secretary's current interpretation of the term "liquids" appears to be based on his fair and considered judgment and consistent with previous interpretations of "liquid" in similar circumstances. Accordingly, deference is warranted to the Secretary's interpretation that the term "liquids" in DC 7203 does not include foods with the texture or quality of purees, soft solids, or semisolids.

We stress that *Auer* deference is not necessary to our conclusion. Even under a less deferential standard, the Court finds the Secretary's interpretation of "liquids" persuasive. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012) (evaluating under the lesser *Skidmore* standard whether deference to an agency's interpretation of an ambiguous regulation was warranted after concluding that *Auer* deference was not warranted); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (noting that an agency's interpretation is entitled to proportional deference depending on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"). Here, the Secretary's interpretation was based on thorough consideration and valid reasoning and is consistent with other interpretations of "liquid." Accordingly, deference to the Secretary's interpretation is warranted.

---

[9] The amended criteria were adopted by final rule, without any additional commentary regarding texture-modified diets or mechanically altered foods, effective September 10, 2017. 82 Fed. Reg. 36,080 (Aug. 3, 2017).

11

Mr. Roby argues, however, that any ambiguity in the regulation should be resolved in his favor due to the pro-claimant nature of the veterans benefits system. Appellant's Br. at 11-12 (citing *Gardner*, 513 U.S. at 118); Appellant's Citation of Supplemental Authority at 1-2. However, as discussed above, the Secretary's interpretation of how the term "liquids" should be applied is not plainly erroneous, is not inconsistent with the regulation, reflects his fair and considered judgment in this matter, and is consistent with prior interpretations. Accordingly, the Court will defer to the Secretary's interpretation. *See Nat'l Org. of Veterans Advocates, Inc. v. Sec'y of Veterans Affairs*, 809 F.3d 1359, 1363 (Fed. Cir. 2016); *Guerra v. Shinseki*, 642 F.3d 1046, 1051 (Fed. Cir. 2011); *Sears v. Principi*, 349 F.3d 1326, 1331-32 (Fed. Cir. 2003) (all rejecting the argument that the pro-veteran canon of construction overrides deference due to VA's reasonable interpretation of an ambiguous statute).

The Board denied entitlement to an evaluation in excess of 30% because "the evidence of record shows that [Mr. Roby] is able to consume food, albeit with difficulty, and that his esophageal stricture is not severe, permitting liquids *only*." R. at 11 (emphasis in original). The Board's analysis is consistent with the clear meaning of "permitting" and "[p]ermitting passage" and with the Secretary's interpretation of "liquids." Therefore, the Court concludes that Mr. Roby fails to demonstrate that the Board erred in denying entitlement to an evaluation in excess of 30%. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) (appellant bears the burden of demonstrating error on appeal), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table).

### C. Appellant's Arguments Regarding Chewing a Solid into a Liquid

In addition to arguing that most foods he eats are themselves liquids, Mr. Roby argues that he liquefies other foods, such as chicken and sandwiches, through chewing. He contends that he chews each bite of food for 10 to 15 minutes resulting in the food being of "liquid consistency" prior to it passing through his esophagus. Oral Argument at 2:08-3:02; 18:21-20:45 (equating the terms "liquid," "liquid consistency," "liquefied food," and "thoroughly chewed solid food"); *see* R. at 68, 1396-97, 1400-01. He points to no medical evidence in the record, such as a physician statement or medical treatise, to support his contention, but instead argues that his lay statements alone are competent to describe foods as being in a liquid state when they pass through his esophagus because that type of information is perceptible through one's five senses. Oral Argument at 21:15-22:43; *see Layno v. Brown*, 6 Vet.App. 465, 469 (1994) (explaining that a witness is competent to testify as to any fact that is within his or her personal knowledge, "which comes to

12

the witness through the use of his [or her] senses—that which is heard, felt, seen, smelled, or tasted").

The Secretary argues that Mr. Roby has not carried his burden of supporting his assertions with competent evidence that chewing can turn a solid food into a liquid. Secretary's Br. at 15-16; Oral Argument at 44:10-45:47. He argues that, although there may be instances when a solid food will transform into a liquid prior to passing through the esophagus, Mr. Roby has not cited evidence that the solid foods he eats, such as chicken, are transformed into a liquid, as opposed to remaining as a chewed solid, prior to swallowing. Oral Argument at 36:58-38:18.

Here, the Court has determined that the term "liquids" in DC 7203 is ambiguous, but deferred to the Secretary's interpretation—that the ordinary definition of "liquids" does not include foods that have a textual quality like purees, soft solids, semisolids, or *chewed solids*. Thus, Mr. Roby's argument that he can chew solid food into a liquid is not in accord with the meaning of "liquids" in DC 7203 and the Court does not need to address this matter further.

### D. Remaining Arguments

#### 1. The Board's Authority to Interpret DC 7203

Mr. Roby additionally argues that, because the RO did not interpret the language of DC 7203, the Board lacked jurisdiction to interpret that DC in the first instance and that, to the extent that the Board identified ambiguity in the DC in this case, it deprived him of the right to one review on appeal. Appellant's Br. at 12-13 (citing *Disabled American Veterans v. Sec'y of Veterans Affairs*, 327 F.3d 1339, 1346 (Fed. Cir. 2003)); Oral Argument at 22:48-24:47 (arguing that, although the Board did not explicitly find DC 7203 ambiguous, its decision is premised on an implicit ambiguity in the regulation requiring that food be in a liquid state when it enters the mouth to satisfy the criteria for a 50% evaluation). The Court disagrees.

Regardless of how the RO analyzed Mr. Roby's case vis-à-vis DC 7203, the Board is not precluded from interpreting or reaching conclusions about regulatory language where the RO did not reach the same conclusion or make the same interpretation. Although Mr. Roby acknowledges that the Board need not remand in order to consider law not previously considered by the RO, *see Disabled American Veterans*, 327 F.3d at 1349,[10] 38 C.F.R. § 19.9(d)(2) (2018); he argues that

---

[10] The U.S. Court of Appeals for the Federal Circuit's analysis specifically identifies 38 C.F.R. § 19.9*(b)*(2), but the regulation was amended by final rule in 2011, resulting in this remand exception that was previously found in § 19.9(b)(2) being moved to § 19.9(d)(2). 76 Fed. Reg. 17,544 (Mar. 30, 2011).

§ 19.9(d)(2) does not allow the Board to find ambiguity in the first instance because, if it did, that interpretation would not receive one review on appeal, Appellant's Br. at 12-13 (arguing that "[u]nless the RO first decides an issue of regulatory interpretation, the Board has no jurisdiction over the question"); Oral Argument at 23:46-24:25.

Logic belies his argument, as this distinction would purportedly allow the Board, under § 19.9(d)(2), to consider and find ambiguity in the regulatory language where the RO completely failed to consider DC 7203, but not where the RO applied DC 7203 but found it unambiguous. Moreover, the Board conducts de novo review of RO decisions based on the entire record, *see* 38 U.S.C. § 7104(a); *Disabled American Veterans v. Sec'y of Veterans Affairs*, 419 F.3d 1317, 1319 (Fed. Cir. 2005); 38 C.F.R. § 19.7 (2018), and is free to deny a claim on a different basis than that on which the RO denied the same benefit. Even if the Board found ambiguity in the regulatory language, it was free to do so and was not bound by an RO decision that did not explicitly find ambiguity.

At oral argument, however, Mr. Roby seemingly changed course, arguing that the Board was without jurisdiction to interpret DC 7203 because the exclusive authority to interpret ambiguities in regulatory language is vested with VA's Office of General Counsel (OGC). Oral Argument at 22:48-23:45. Although the Board is bound by interpretative guidance rendered in "precedent opinions of the chief legal officer of the Department," 38 U.S.C. § 7104(c), the Board is not precluded from interpreting regulatory language in the absence of such guidance from the OGC. *See Hudgens v. McDonald*, 823 F.3d 630, 638 (Fed. Cir. 2016) (noting that "[i]f the Secretary is dissatisfied with the Board's interpretation of a regulation, the Secretary may instruct the Board regarding what the Secretary believes is the correct interpretation, and such instructions are binding on the Board" (citing 38 U.S.C. § 7104(c))). In fact, in assessing whether the Secretary's interpretation of ambiguous statutory or regulatory language should be afforded deference, courts routinely look to decisions of the Board to determine if the Board's interpretation is consistent with that of the Secretary, even where there is not a precedential OGC opinion. *See id.* at 638-39; *Fountain v. McDonald*, 27 Vet.App. 258, 267-71 (2015). Therefore, Mr. Roby's argument that the Board was without jurisdiction to interpret DC 7203 is unpersuasive.

### 2. Application of 38 C.F.R. § 4.7

Finally, Mr. Roby argues that the Board erred in failing to consider whether his disability more closely approximates the criteria for a 50% evaluation. Appellant's Br. at 14-15; Reply Br.

at 4-5; Oral Argument at 8:46-11:23; *see* 38 C.F.R. § 4.7 (2018) ("Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned."). As support for this argument, he argues that, although he did not meet the criteria for a higher evaluation prior to May 2014, the Board hearing testimony is reflective of increased severity such that, even if he does not meet the criteria for a 50% evaluation, his disability picture more closely approximates the criteria for the higher evaluation. Oral Argument at 8:46-11:23.

Contrary to Mr. Roby's arguments, the Board considered and applied § 4.7. In its recitation of relevant law governing claims for increased evaluations, the Board specifically referenced § 4.7 and its direction to assign the higher evaluation if the disability picture more nearly approximates the criteria for that evaluation. R. at 7. In its analysis, the Board then considered application of § 4.7, but found that symptoms associated with Mr. Roby's achalasia did not more closely approximate the criteria for a 50% evaluation. R. at 11 ("Thus, the evidence shows that [Mr. Roby's] achalasia has not met or approximated the criteria for an increased rating . . . . Rather, it has more nearly approximated the criteria for a 30[%] rating."). In reaching its conclusion, the Board considered the May 2014 Board hearing testimony, along with additional evidence of record, and determined that the evidence as a whole consistently reflected that the severity of Mr. Roby's achalasia did not satisfy or more nearly approximate the criteria for a 50% evaluation. R. at 10-11. Therefore, the Court cannot agree with Mr. Roby that the Board failed to consider § 4.7 and his argument asserting Board error in this respect must fail.

## IV. CONCLUSION

Upon consideration of the foregoing, that portion of the November 17, 2016, Board decision that denied entitlement to a higher evaluation for achalasia is AFFIRMED. The balance of the appeal is DISMISSED.